STATE of Missouri, Respondent,

v.

Carmen L. DECK, Appellant.

No. 80821.

Supreme Court of Missouri,
En Banc.

June 1, 1999.

Rehearing Denied June 29, 1999.

Deborah B. Wafer, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Catherine Chatman, Assistant Attorney General, Jefferson City, for Respondent.

STEPHEN N. LIMBAUGH, Jr., Judge.

A Jefferson County jury convicted Carmen L. Deck, Jr., of two counts of first degree murder, two counts of armed criminal action, one count of first degree robbery, and one count of first degree burglary. Deck was sentenced to death for each of the two murder counts and concurrent life sentences for the two counts of armed criminal action, as well as consecutive sentences of thirty years imprisonment for the robbery count and fifteen years imprisonment for the burglary count. This Court has jurisdiction of the appeal because the death sentence was imposed. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I. Facts

Viewed in the light most favorable to the verdict, *State v. Rousan,* 961 S.W.2d 831 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998), the facts are as follows: In June 1996, Deck planned a burglary with his mother's boyfriend, Jim Boliek, to help Boliek obtain money for a trip to Oklahoma. Deck targeted James and Zelma Long, the victims in this case, because he had known the Longs' grandson and had accompanied him to the Longs' home in DeSoto, Missouri, where the grandson had stolen money from a safe. The original plan was to break into the Longs' home on a Sunday while the Longs were at church. In preparation for the burglary, Deck and Boliek drove to DeSoto several times to canvass the area.

On Monday, July 8, 1996, Boliek told Deck that he and Deck's mother wanted to leave for Oklahoma on Friday, and he gave Deck his .22 caliber High Standard automatic loading pistol. That Monday evening, Deck and his sister, Tonia Cummings, drove in her car to rural Jefferson County, near DeSoto, and parked on a back road, waiting for nightfall. Around nine o'clock, Deck and Cummings pulled into the Longs' driveway.

Deck and Cummings knocked on the door and Zelma Long answered. Deck asked for directions to Laguana Palma, whereupon Mrs. Long invited them into the house. As she explained the directions and as Mr. Long wrote them down, Deck walked toward the front door and pulled the pistol from his waistband. He then turned around and ordered the Longs to go lie face down on their bed, and they complied without a struggle.

Next, Deck told Mr. Long to open the safe, but because he did not know the combination, Mrs. Long opened it instead. She gave Deck the papers and jewelry inside and then told Deck she had two hundred dollars in her purse in the kitchen. Deck sent her into the kitchen and she brought the money back to him. Mr. Long then told Deck that a canister on top of the television contained money, so Deck took the canister, as well. Hoping to avoid harm, Mr. Long even offered to write a check.

Deck again ordered the Longs to lie on their stomachs on the bed, with their faces to the side. For ten minutes or so, while the Longs begged for their lives, Deck stood at the foot of the bed trying to decide what to do. Cummings, who had been a lookout at the front door, decided time was running short and ran out the door to the car. Deck put the gun to Mr. Long's head and fired twice into his temple, just above his ear and just behind his forehead. Then Deck put the gun to Mrs. Long's head and shot her twice, once in the back of the head and once above the ear. Both of the Longs died from the gunshots.

After the shooting, Deck grabbed the money and left the house. While fleeing in the car, Cummings complained of stomach pains, so Deck took her to Jefferson Memorial Hospital, where she was admitted. Deck gave her about two hundred fifty dollars of the Long's money and then drove back to St. Louis County. Based on a tip from an informant earlier that same day, St. Louis County Police Officer Vince Wood was dispatched to the apartment complex where Deck and Cummings lived. Officer Wood confronted Deck late that night after he observed him driving the car into the apartment parking lot with the headlights turned off. During a search for weapons, Officer Wood found a pistol concealed under the front seat of the car and, then, placed Deck under arrest. Deck later gave a full account of the murders in oral, written and audiotaped statements.

## II. Motion for Change of Venue

Deck first contends that the trial court erred in overruling his motion for change of venue filed under Rule 32.04. As grounds for the motion, he stated that "the case ha[d] received extensive publicity by way of newspaper and television coverage" and that "[t]he residents of Jefferson County [were] biased and prejudiced against defendant and defendant [could] not receive a fair trial." The trial court overruled the motion after an evidentiary hearing, finding that there was not "such overwhelming pre-trial publicity as is likely to render impossible the selection of an impartial jury." Deck now claims that the trial court's error violated his rights to due process of law, trial by fair and impartial jury, reliable sentencing, and freedom from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 10, 18(a), and 21 of the Missouri Constitution.

A change of venue is required when it is necessary to assure the defendant a fair and impartial trial. *State v. Kinder*, 942 S.W.2d 313, 323 (Mo. banc 1996). The decision to grant or deny a request for change of venue for cause rests within the trial court's discretion, *State v. Feltrop*, 803 S.W.2d 1, 6 (Mo. banc 1991), and the trial court's ruling will not be reversed absent a clear showing of abuse of discretion and a real probability of injury to the complaining party. *Id.* A trial court abuses its discretion, however, when the record shows that the inhabitants of the county are so prejudiced against the defendant that a fair trial cannot occur there. *Id.; Kinder*, 942 S.W.2d at 323. In reviewing the trial court's ruling, it is understood that the trial court, rather than the appellate court, is in the better position to assess the effect of publicity on the members of the community. *Feltrop*, 803 S.W.2d at 6. Finally, in assessing the impact of potentially prejudicial publicity on

prospective jurors, the critical question is not whether they remember the case, but whether they have such fixed opinions regarding the case that they could not impartially determine the guilt or innocence of the defendant. *Id.*

■ At the hearing on the motion, Deck introduced into evidence nine newspaper articles and several videotapes of television news broadcasts, all of which appeared within a few weeks of the July 8 murders. In addition, Deck offered the testimony of Dr. Kenneth Warren, a professor of political science at Saint Louis University, who was commissioned to conduct an opinion poll to determine the extent to which residents of Jefferson County had heard of the case. Dr. Warren's poll, which was taken between November 13, 1996 and December 9, 1996, more than a year before trial, consisted of a survey of five hundred eighteen residents of Jefferson County. The results showed that sixty-nine percent of the people polled were aware of the case and twenty-seven percent held an opinion regarding Deck's guilt. These circumstances, Deck maintains, demonstrate that the Jefferson County community was saturated with publicity about the case that was prejudicial to him, and thus the trial court abused its discretion in overruling his motion for change of venue.

To reinforce his position, Deck also notes that during jury selection, fifty of the prospective jurors indicated that they had heard about or read about the case. Thirteen of the fifty stated that they had formed opinions regarding Deck's guilt based on the publicity and that it would be difficult or impossible for them to render a fair and impartial verdict. Deck renewed his motion for change of venue at that point, and the trial court again overruled the motion.

The fact that so many residents of Jefferson County were aware of the case does not alone mandate a change of venue. Although Dr. Warren testified that sixty-nine percent of the residents polled were aware of the case, he conceded on cross-examination that with the passage of time, fewer people would remember what they had heard. Further, although twenty-seven percent said that they held an opinion regarding Deck's guilt, Dr. Warren did not inquire whether those opinions would keep them from following the law and making a determination based on the evidence adduced at trial. As to the prospective jurors, the key concern, as noted, is whether those jurors who had heard about the case held such fixed opinions that they could not make an impartial determination regarding the defendant's guilt. *Feltrop,* 803 S.W.2d at 6. During voir dire, only thirteen of the fifty prospective jurors who had heard about the case stated that their opinions would keep them from being fair and impartial jurors, and of those thirteen, twelve were stricken for cause or otherwise excused. Defense counsel declined to strike the remaining person who apparently changed her response by stating that she had not formed an opinion and could indeed follow the instructions and consider only the evidence at trial. Given the limited inferences that can be made from the polling data and the trial court's effective handling of the voir dire process, there is no indication that Deck was denied a fair and impartial jury.

■ Citing *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.1998), Deck further claims that the pretrial publicity in Jefferson County should be considered presumptively prejudicial. According to *Ainsworth,* "[p]rejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Id.* Prejudice occurs, for instance, where there is "a barrage of inflammatory publicity immediately prior to trial amounting to a huge ... wave of public passion." *Id.* (quoting *Patton v. Yount,* 467 U.S. 1025, 1033, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). Under *Ainsworth,* courts should also consider whether the media accounts were primarily factual and whether the accounts con-

tained inflammatory, prejudicial information that was not admissible at trial. *Id.* Under the facts of *Ainsworth,* however, the court determined that the media coverage was not presumptively prejudicial because the coverage was factual in nature and occurred, for the most part, several months before trial. *Id.* The case at hand is similar: The media accounts were factual in nature and occurred long before trial, and there was no "barrage of inflammatory publicity immediately prior to trial."

The evidence presented at the hearing on Deck's motion for change of venue and during voir dire did not show that the residents of Jefferson County were so prejudiced against him that a fair trial could not occur. As such, the trial court did not abuse its discretion in denying the motion for a change of venue.

### III. Motion to Suppress

Deck next claims ·that the trial court erred by overruling his motion to suppress and in admitting at trial the statements he made to the police as well as the pistol and other items seized from his car. In support of his claim, Deck states that Officer Wood did not have "reasonable suspicion" to stop him on the parking lot, and therefore the stop was unlawful. As a result, he contends, the evidence seized and his incriminating statements should have been excluded as "fruit of the poisonous tree." Deck concludes that introduction of the evidence at trial violated his rights to due process of law, to be free from unreasonable search and seizure, to reliable sentencing, and to be free from cruel and unusual punishment under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and article I, sections 10, 15, 18(a), and 21 of the Missouri Constitution.

■ At a hearing on a motion to suppress and ultimately at trial, the state has the burden to justify a warrantless search and seizure. *State v. Villa–Perez,* 835 S.W.2d 897, 902 (Mo. banc 1992). In reviewing the trial court's ruling on the matter, this Court considers the record made at the suppression hearing as well as the evidence introduced at trial. *State v. Hohensee,* 473 S.W.2d 379, 380 (Mo.1971); *State v. Howard,* 973 S.W.2d 902, 908 (Mo. App.1998).

■ The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures. Missouri's constitutional "search and seizure" guarantee, article I, section 15, is co-extensive with the Fourth Amendment. *State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996). A warrant based upon probable cause is generally required to justify a search or seizure. However, the Fourth Amendment does not prohibit a so-called *"Terry"* stop—a stop followed by a "frisk" or "pat-down" for weapons—that is based on reasonable suspicion supported by articulable facts that the person stopped is engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 30, ·88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* "stop and frisk" principles have been extended to motor vehicle stops so that police who have the requisite reasonable suspicion may conduct a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden...." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). "Reasonable suspicion," which is a less demanding standard than "probable cause," *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), is to be determined by reference to the "totality of the circumstances." *Id.* (citing *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Although the state's evidence presented at the suppression hearing and at trial was uncontested, a more detailed recitation of that evidence is necessary to evaluate the grounds for reasonable suspicion. On the day of the murders, an individual identified as Charles Hill told the Jefferson County

Sheriff's Office that he believed that Deck and his sister were involved in a robbery and/or homicide in Jefferson County, that they would be driving a gold two-door car, and that they probably were armed. This information was relayed to the St. Louis County Police, and Officer Woods was dispatched to locate Deck and his sister at their last known address, an apartment complex in St. Louis County.

Sometime after 11 o'clock at night, Officer Wood, who was parked in his vehicle on the side of the road at the apartment complex, saw Deck drive by alone in a two-door gold car and pull into a parking space. The lights to Deck's car were not illuminated even though it was dark. Officer Wood walked toward Deck's car, identified himself as a police officer, and shined his flashlight into the car, whereupon Deck turned away from him and leaned down toward the passenger side of the vehicle. At that point, Officer Wood ordered Deck to sit up and show his hands, and when Deck complied, Officer Wood then asked him to get out of the car. Once outside the car, Officer Wood patted Deck down for weapons, and finding none, then searched the passenger side of the vehicle while a back-up officer detained Deck. When the search revealed a pistol concealed underneath the front seat, Officer Wood placed appellant under arrest for unlawful use of a weapon. The police then impounded the vehicle, and during an inventory search, Officer Wood found the victims' decorative tin filled with coins on the vehicle's floorboard. As noted, Deck later made oral, written, and taped statements.

 Deck's primary argument, as we understand it, is that he was unlawfully stopped, or "seized," for the offense of driving without lights when Officer Wood first approached him as he parked the car. As Deck explains, there was no probable cause to be stopped because the statute defining the offense, section 307.040.1, RSMo 1994, applies only to public streets and highways, not to private parking lots

like the one at the apartment complex. Regardless of the presence or absence of probable cause under the statute, however, Deck's argument fails because no stop or seizure took place when Officer Wood first approached the car. A person is not "seized" until either being subjected to the application of physical force by the police or by voluntarily submitting to the assertion of police authority. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Here, Officer Wood did not stop Deck's car, nor did he display his weapon as he approached the vehicle, and instead he merely identified himself and said something like "how you doing?" Under these circumstances, Deck was not subject to the physical control of Officer Wood nor did he submit to Officer Wood's authority when the officer approached the vehicle.

That is not to say, however, that Officer Wood could not have lawfully stopped Deck when he first saw him. Even if there was no probable cause to stop Deck for the *offense* of driving without lights, the *act* of driving without lights late at night in a residential parking lot was some indication that criminal activity was afoot, separate from the offense of driving without lights, itself. That evidence, when coupled with the information relayed by the dispatcher to Officer Wood—that Deck and his sister would be driving a two-door gold car and should be considered armed and dangerous—constituted "reasonable suspicion" that would justify a *"Terry"* stop, at the least.

 Notwithstanding Officer Wood's justification to stop Deck when he first pulled into the parking lot, the actual stop or seizure did not occur until later in the sequence of events when even more evidence developed that gave rise to "reasonable suspicion." Deck's reaction to the initial encounter with Officer Woods was to turn away and reach down toward the passenger side of the vehicle as if he was reaching for something or attempting to conceal something. Only when Officer

Wood ordered Deck to sit up and display his hands, and Deck then complied, thereby submitting to the assertion of police authority, did the seizure occur. *See Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547. The state's evidence was more than ample to support a reasonable and articulable suspicion that Deck was engaged in criminal activity. *See State v. Hunter*, 783 S.W.2d 493, 495 (Mo.App.1990) (officer had reasonable suspicion to justify investigatory stop where passenger ducked out of sight in an apparent effort to hide something under the seat when officer turned on his "take-down" lights). Thus, under *Terry*, Officer Wood was justified in conducting the ensuing detention, the order to exit the car, and the pat-down search for weapons. In addition, under *Michigan v. Long*, 463 U.S. at 1051, 103 S.Ct. 3469 Officer Wood's subsequent search of the passenger area of the car and the seizure of the pistol from beneath the passenger seat were permissible as part of a "protective sweep" for weapons. Further, after finding the pistol, Officer Wood had probable cause to arrest Deck for unlawful use of weapons. Considering the totality of the circumstances, Officer Wood's conduct was lawful in all of these respects.

 As a secondary point, Deck contends that the detention, search and seizure were unlawful because they were based on an informant's tip without any showing that the source of the information was reliable. Although the informant identified himself as Charles Hill, the record does not reveal whether the police had any gauge of his reliability at the time the tip was made,[1] and accordingly, Deck analogizes the situation to cases involving anonymous tips. While it is correct, in general, that a detention and search and seizure is unlawful if conducted solely on the basis of an anonymous tip, *Alabama v. White*, 496 U.S. at 329, 110 S.Ct. 2412, no

case has held that an anonymous tip must be ignored in determining whether "reasonable suspicion" exists. Instead, police may properly consider such evidence if it is in conjunction with, as here, other, independent corroborative evidence suggestive of criminal activity. *Id.* at 329–332, 110 S.Ct. 2412. In this case, the information from Hill was corroborated by Officer Wood's observation of 1) a two-door, gold car that matched the description of the car Deck was said to be driving and that pulled in the parking lot of the apartment complex where Deck was said to reside; 2) the same car being driven with the lights off late at night as if to avoid detection; and 3) the driver's reaction when he first saw Officer Woods. In essence, the evidence that corroborates the anonymous tip is the same evidence that, when considered with the anonymous tip, constitutes the grounds for reasonable suspicion.

Because the state has met its burden of showing that no Fourth Amendment violation occurred, this Court holds that the trial court correctly overruled the motion to suppress and properly admitted the evidence in question at trial.

## IV. Voir Dire

### A. Gender-*Batson* Challenges

Deck next claims that the trial court erred in overruling his objections to the state's peremptory strikes of two female venirepersons in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). In *Batson*, the United States Supreme Court prohibited the use of peremptory strikes to exclude potential jurors based on race, *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, and in *J.E.B.*, *Batson* was extended to prohibit peremptory strikes on the basis of gender. *J.E.B.*, 511 U.S. at 146, 114 S.Ct. 1419.

---

1. Charles Hill testified at the preliminary hearing that he was a retired Marine sergeant and a former boyfriend of Tonia Cummings, who overheard Deck and Cumming's plan for the robbery/murder about a week before it was carried out. Hill did not, however, testify at the suppression hearing or at trial.

██ Missouri has adopted a three-step process for making a successful *Batson* challenge. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). First, the defendant must object to the state's peremptory strike and identify the protected class to which the prospective juror belongs. *Id.* The state is then required to provide a reasonably specific and clear, race and/or gender-neutral explanation for the strike. *Id.* If the state provides such an explanation, the burden then shifts to the defendant to show that the state's explanation was pretextual and that the strike was actually motivated by the prospective juror's race or gender. *Id.*

██ In evaluating the prosecutor's explanation, the chief consideration is whether the explanation is plausible in light of the totality of the facts and circumstances surrounding the case. *Id.* While the presence of similarly-situated white or male jurors is probative of pretext, it is not dispositive. *Id.* This Court will reverse the trial court's decision on a *Batson* challenge only upon a showing of clear error. *Id.*

The first of the two gender-*Batson* challenges involved prospective juror number sixteen, a female, who the prosecutors struck with the following explanation:

> MR. JERRELL: Your Honor, the first time I laid eyes on … and heard her speak, I thought she was a very weak juror. In fact, that's what I wrote in my notes during the middle of voir dire. Also her son's been prosecuted … and I can't even read my own writing, but I don't want any juror on there, at least her, where her son's been prosecuted.

> MR. WILKINS: Actually it's not her son. Her ex-brother-in-law is in the Department of Corrections for burglary and his son has a current charge pending in our county.

> MR. JERRELL: I stand corrected. Exactly what my notes say. That's my reasons for [her].

> MR. WILKINS: Likewise, Your Honor, I had independent of Mr. Jerrell also written the word weak on [her] and independent of him, also based upon.

██ The prosecutors' responses indicate that prospective juror number sixteen was stricken not because of her gender but because she would be a "weak" juror and she had relatives who had been or were being prosecuted. An explanation based on a prospective juror's general demeanor, which in this case gave rise to the perception that she was "weak," is facially non-discriminatory. *State v. Smulls*, 935 S.W.2d 9, 15 (Mo. banc 1996). So too is the fact of the arrest, conviction, or incarceration of a prospective juror's relative. *State v. Payne*, 958 S.W.2d 561, 565 (Mo. App.1997); *State v. Johnson*, 930 S.W.2d 456, 461–62 (Mo.App.1996). These explanations were reasonably specific, clear and gender-neutral and thus satisfied the second prong of the *Batson* analysis.

The second gender-*Batson* challenges involved prospective juror number fifty, a female, who was struck for the following reasons:

> MR. JERRELL: As for [her], I didn't think much of her either. She does have what we believe to be a prior DWI in Kirkwood, which she never mentioned, from our research on her. I also felt that she was not a strong juror. So that's why we decided to strike her.

> MR. WILKINS: Quite frankly, she has a prior DWI in the City of Kirkwood. That's what the criminal history record shows. She was very red-cheeked, six-tiesh, sixty-eight, single. My concern, my interest was that that might signal an alcohol habit, problem, whatever. Had nothing to do with the fact that she was female.

██ The prosecutors' responses indicate that prospective juror number fifty was struck from the panel because she had a prior DWI conviction that she did not disclose. As stated, a prior conviction is an appropriate and neutral basis for a

peremptory strike. *Payne*, 958 S.W.2d at 565. Deck argues, however, that the strike was pretextual because the prosecutors chose not to strike a similarly situated male who stated during voir dire that he was arrested and pled guilty to driving while intoxicated. To the contrary, the male prospective juror was not similarly situated to her because he admitted his DWI conviction when the prosecutor asked about prior arrests and convictions during voir dire while she did not. Deck further contends that the prosecutors could not properly base the peremptory strike on her DWI because no information regarding the offense was brought out during voir dire. Deck fails to recognize, however, that lawyers are not prohibited from using information outside the record as a basis for a peremptory strike. *See State v. Whitfield*, 837 S.W.2d 503, 509 (Mo. banc 1992) (arrest records may be accessed for use in selecting jury).

In sum, Deck has not shown that the prosecutors' reasons for striking these two potential jurors were merely pretextual and that the strikes were motivated by gender. The point is denied.

### B. Challenge for Cause

■ Deck also contends that the trial court erred in overruling his motion to strike prospective juror Scott Arnold who gave some indication during voir dire that he might automatically impose the death penalty. According to Deck, this error violated his rights to due process of law, to a fair and impartial jury, to reliable sentencing, and to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 10, 18 and 21 of the Missouri Constitution. However, because Deck used a peremptory strike to remove Mr. Arnold from the panel and Mr. Arnold did not serve as a member of the jury, the claim is precluded by section 494.480.4, RSMo 1994, which states:

The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for the granting of a motion for new trial or the reversal of a conviction or sentence unless such juror served upon the jury at the defendant's trial and participated in the verdict rendered against the defendant.

The point is denied.

### V. Penalty Phase—Victim Impact Testimony

Deck asserts that the testimony of William Long, the son of the victims, exceeded the guidelines for victim impact evidence established by the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and that the trial court erred in overruling his motion for a mistrial because of the resulting emotional reaction in the courtroom. The matter arose as part of the state's penalty phase testimony when William Long read a statement that the family had prepared. After his testimony, three members of the jury were crying, as were members of the Long family who were seated in the courtroom.

■ Victim impact evidence is admissible under the United States and Missouri Constitutions. *State v. Roberts*, 948 S.W.2d 577, 594 (Mo. banc 1997), *cert. denied.* —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). According to *Payne*, just as the defendant is entitled to present evidence in mitigation designed to show that the defendant is a "uniquely individual human being," the State is also allowed to present evidence showing each victim's "uniqueness as an individual human being." *Payne*, 501 U.S. at 822–23, 111 S.Ct. 2597. In particular, "the State is permitted to show that victims are individuals whose deaths represent a unique loss to society and to their family and that the victims are not simply 'faceless strangers.'" *Id.* at 825, 111 S.Ct. 2597. *Payne* also holds that victim impact evidence violates the constitution only if it is so "undu-

ly prejudicial that it renders the trial fundamentally unfair." *Id.* Deck argues that the evidence in this case violated this standard and that the jury based its verdict on emotion. He does not, however, complain of the testimony itself, but of the emotional level in the courtroom and the effect it had on the jury.

■ Although emotional outbursts are to be prevented insofar as possible, the trial court exercises broad discretion in determining the effect of such outbursts on the jury. *State v. Brooks,* 960 S.W.2d 479, 491 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998). Additionally, this Court has held that "[i]n determining whether to declare a mistrial, the trial court may consider the spontaneity of the outburst, whether the prosecution was at fault, whether something similar, or even worse, could occur on retrial, and the further conduct of the trial." *Id.*

■ Deck does not point to specific instances in the record that indicate an "extreme emotional level," and therefore, it is difficult to do otherwise than defer to the trial court's discretion. A review of the record does not reflect the "extreme emotional level" Deck describes. There were apparently no emotional outbursts among the family members, only some muted crying during the testimony of the Long children. Furthermore, there is no reason to believe that the family members would not have the same reaction on retrial. In the absence of evidence that emotional outbursts actually occurred, the trial court did not abuse its discretion in overruling Deck's motion for a mistrial.

## VI. Penalty Phase—Mitigating Instructions

### A. Non–MAI Instructions

■ Deck next contends that his state and federal constitutional rights were denied when the trial court erroneously refused to submit two non-MAI mitigating circumstance instructions in the penalty phase. Deck's proposed instructions, loosely based on MAI–CR3d 313.44(a), listed six nonstatutory mitigating circumstances for the jury's consideration. This Court again rejects this often-raised claim that the listing of nonstatutory factors in mitigation is constitutionally required. *State v. Clay,* 975 S.W.2d 121, 133 (Mo. banc 1998) *cert. denied,* —— U.S. ——, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999); *Rousan,* 961 S.W.2d at 849.

### B. Defective Submission of MAI–CR3d 313.44A

■ Deck raises the far more problematic claim that the defective submission of Instructions No. 8 and No. 13, the penalty phase instructions on the submission of mitigating circumstances, constituted plain error and violated his right to due process of law, to reliable sentencing, and to be free from cruel and unusual punishment as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 10 and 21, of the Missouri Constitution. The defect was that the final two paragraphs of MAI–CR3d 313.44A, the pattern mitigating circumstances instruction, were inadvertently omitted from Instructions No. 8 and No. 13. That omission, as Deck maintains, created a reasonable likelihood that the jurors mistakenly believed they had to find the existence of any specific mitigating circumstance *by unanimous vote.*

Instruction No. 8, as submitted to the jury, stated:

## INSTRUCTION NO. 8

As to Count I, if you unanimously find that the facts and circumstances in aggravation of punishment, taken as a whole, warrant the imposition of a sentence of death upon the defendant, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in

aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of the trial.

Instruction No. 13 was identical, except that it referred to Count III.

 The final two paragraphs of MAI–CR 3d 313.44A, which were omitted from the instructions in this case, read as follows:

You shall also consider any (other) facts or circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Because Deck failed to object to these instructions at trial, this Court is asked to review for plain error. For instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury so that it is apparent that the instructional error affected the verdict. *State v. Doolittle,* 896 S.W.2d 27, 29 (Mo. banc 1995).

 In a capital case, the sentencer may not be precluded from considering, as a mitigating factor, any relevant circumstance that the defendant proffers as a basis for a sentence less than death. *Mills v. Maryland,* 486 U.S. 367, 374, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). This principle is violated if the jury is given an instruction that could reasonably be interpreted as precluding them from considering any mitigating evidence unless the jurors unanimously agree on the existence of such evidence. *Id.* at 384, 108 S.Ct. 1860. On the other hand, there is no constitu-

tional requirement that the jury in a capital case be given any particular guidance as to how to undertake the discretionary sentencing decision. *Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 761–62, 139 L.Ed.2d 702 (1998).

The fallacy of Deck's argument—that the jury was likely misled into believing that they had to find mitigating circumstances by unanimous vote—is that it wrongly assumes that the omitted paragraph was necessary to comply with the holding in *Mills. See State v. Petary,* 790 S.W.2d 243 (Mo. banc 1990). Before MAI–CR 3d 313.44 was revised, effective January 1, 1989, the omitted paragraph was not part of the pattern instruction, and in its place, was a paragraph that read as follows:

If you unanimously find that one or more mitigating circumstances exist sufficient to outweigh the aggravating circumstances found by you to exist, (then) (then, on Count ___) you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

Like Instructions No. 8 and No. 13 in this case, the old version of the pattern instruction did not specifically advise the jurors that they need not unanimously find the existence of a particular mitigating facts or circumstances. Nonetheless, the old version, despite the alleged defect, survived essentially the same constitutional challenge under *Mills* that is now brought in this case. *State v. Weaver,* 912 S.W.2d 499, 518 (Mo. banc 1995); *Petary,* 790 S.W.2d at 245. Although the alleged defect in this case was the omission of the final paragraph of the instruction, rather than the inclusion of an allegedly defective paragraph in the old version of the instruction, the alleged defect is essentially the same—that both instructions purported to require unanimous votes on mitigating circumstances.

The rationale of this Court's holding in *Weaver* and *Petary* is that when the in-

structions in question are considered in conjunction with all the other instructions, the jury is not misled. *Id.* Here, as in *Weaver* and *Petary,* additional explanatory instructions were submitted for both counts. Those instructions, No. 9 and No. 14, were based on MAI–CR 3d 313.46A and were identical except for reference to different counts. Instruction No. 9 stated:

> As to Count I, you are not compelled to fix death as the punishment even if you do not find the existence of facts and circumstances in mitigation of punishment sufficient to outweigh the facts and circumstances in aggravation of punishment. You must consider all the evidence in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you.

This Court observed in *Petary* that MAI–CR 3d 313.46A informs the jury,

> in unmistakable terms that it is never obliged to return death sentence. It has already been told that, in making this decision, it may consider any circumstances it finds in mitigation of punishment. It is clear that in making this final resolution each juror may consider any fact or circumstance which he or she considers sufficient to indicate mitigation, or, for that matter, a juror may vote against a death sentence without having a reason.

*Petary,* 790 S.W.2d at 246.

Because Instructions No. 9 and No. 14 were submitted along with Instructions No. 8 and No. 13, it was made clear to each juror that he or she was individually afforded the discretion to find mitigating circumstances, without unanimity with the other jurors, and vote against a death sentence on the basis of those individual findings alone. Furthermore, the possibility that the jurors were misled should be discounted even more by the fact that defense counsel argued forcefully in his closing that each juror had the individual right to vote for a sentence of life.

Despite Deck's assertions, Instructions No. 8 and No. 13 explicitly require unanimity only in finding facts and circumstances in *aggravation* of punishment. There is no basis for reading that requirement into the rest of the instruction. In fact, it is all the more unlikely that the jurors perceived a unanimity requirement in this case, because there were no statutory mitigators submitted for their consideration. The instructions, as given and taken as a whole, effectively guided the jurors through the deliberation process as set out in sections 565.030 and 565.032, RSMo 1994, and there is no reasonable likelihood that the jury applied the challenged instructions in a way that prevented the consideration of mitigating circumstances.

In a related argument, Deck contends that the jury was not instructed that they must return a verdict fixing punishment at imprisonment for life if the evidence in mitigation of punishment was sufficient to outweigh the evidence of aggravation of punishment, as required by section 565.030.4(3), RSMo 1994. We disagree. While it is true that Instructions No. 8 and No. 13 did not explicitly mandate the punishment at life imprisonment if the circumstances in mitigation outweighed the circumstances in aggravation, it was nonetheless clear from the other instructions that that result must follow because life imprisonment was the only sentencing alternative available. The point is denied.

## C. Failure to Define "Mitigating"

The next issue involves an unusual incident that occurred during the jury's deliberations. The jury sent a note to the trial court asking, "What is the legal definition of mitigating (as in mitigation circumstances)? Instruction 8." The trial court replied, "Any legal terms in the instructions that have a 'legal' meaning would have been defined for you. Therefore, any terms that you have not had defined for you should be given their ordinary meaning." The jury followed up with a note inquiring "Can we have a dictionary?"

The trial court informed the jury, "No, I'm not permitted to give you one." Deck contends that this apparent confusion on a legal issue obligated the trial court to provide the requested definition and that the failure to do so compounded the error concerning the omitted paragraphs from Instructions No. 8 and No. 13. Significantly, Deck did not raise this issue at trial. When the jury posed the questions, Deck did not request that the term "mitigating" be defined, nor did he object to the trial court's responses. In the absence of an objection, Deck asks for plain error review under the manifest injustice standard of Rule 30.20.

■ Despite the fact that one or more jurors may have been confused, the trial court gave the correct responses to the questions. The first question was a request for the "legal definition" of "mitigating," but this word is not defined in the MAI–CR 3d instructions. *See* MAI–CR 3d 313.44A (10–1–94); MAI–CR 3d 333.00 (1–1–87). This Court has held that "[w]hen MAI notes on use do not provide for a definition, the court must not give one." *State v. Feltrop*, 803 S.W.2d 1, 14 (Mo. banc 1991). In *State v. Wise*, 879 S.W.2d 494, 518 (Mo. banc 1994), a case particularly on point, the defendant claimed the trial court erred in refusing the defendant's tender of an instruction defining the term "mitigation." In upholding the trial court's ruling, this Court stated, "MAI instructions do not define 'mitigation'; therefore, the court properly refused the proposed definition." *Id.* Consistent with *Feltrop* and *Wise*, the notes on use to the MAI–CR 3d instruction on definitions provides:

A definition of a term, word, or group of words shall not be given unless permitted by paragraphs A, B, C, D, or E above, [not applicable in this case] even if requested by counsel or the jury. If the jury, while deliberating, requests the definition of a term whose definition is not permitted by paragraphs A, B, C, D,

or E above, the following response is suggested:

I am not permitted to define the word(s) _____ for you. (Except for those terms for which you have been supplied definitions, each) (Each) word used in the instruction has its common and generally understood meaning.

MAI–CR 3d 333.00 (1–1–87), Note on Use 2. As noted, the trial court followed this instruction to the letter. No error was committed.

■ Additionally, the trial court was correct in refusing to provide a dictionary for the jury. All courts view the use of a dictionary as highly improper because the jury should rely solely upon the evidence and the court's instructions. *State v. Suschank*, 595 S.W.2d 295, 297–98 (Mo.App. 1979). The impropriety of permitting jurors to search a dictionary is that it allows them to select at will definitive language that might misrepresent the court's instructions. *State v. Taylor*, 581 S.W.2d 127, 129 (Mo.App.1979). In view of these cases, Deck's position that the judge may supplement an instruction with a dictionary definition is not persuasive.

■ The essence of Deck's argument is that the penalty phase instructions, and the mitigating circumstances instructions in particular, are too easily misunderstood. At the hearing on the motion for new trial, Deck called Dr. Richard Weiner, a psychologist, who testified that "Missouri penalty phase instructions are poorly understood." Dr. Weiner explained that he came to that conclusion as a result of a study he conducted that also showed that jurors have the most difficulty with the concept of mitigation. Dr. Weiner's study, however, must be discounted because the people interviewed for the study did not act as jurors. They were given hypothetical facts that were different than the facts in this case, and they did not hear the testimony of witnesses, observe physical evidence or deliberate with eleven other jurors. More importantly, in the context of the instructions as a whole, the term

"mitigating" is always contrasted with the term "aggravating" so that no reasonable person could fail to understand that "mitigating" is the opposite of "aggravating." That contrast, for instance, is highlighted in Instructions No. 9 and No. 14, which were based on MAI–CR 3d 313.465A and which stated in pertinent part, "you are not compelled to fix death as the punishment even if you do not find the existence of facts and circumstances in mitigation of punishment sufficient to outweigh the facts and circumstances in aggravation of punishment...."

■ Finally, Deck's suggestion that the jury's confusion about the word "mitigating" was due in large part to the omission of the concluding paragraphs to Instructions No. 8 and No. 13 likewise has no merit. Those omitted paragraphs do not even purport to define mitigation for the jury. Moreover, Deck's notion that the jury questions reveal that some jurors "thought they were prohibited from considering certain facts or circumstances as 'mitigating'" and therefore in violation of *Mills v. Maryland,* rests on pure speculation and does not logically follow from the content of the questions.

For these reasons, this Court concludes that the trial court committed no error in refusing to define the term "mitigating" or to provide the jury with a dictionary.

## VII. Penalty Phase—Closing Argument

■ Deck next alleges that the trial court erred in permitting the prosecutor to make improper comments during penalty phase closing argument. The trial court has broad discretion in controlling the scope of closing argument and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant. *State v. Rousan,* 961 S.W.2d 831, 851 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). In order for a prosecutor's statements to have such a decisive effect, there must be a reasonable probability that the verdict would have

been different had the error not been committed. *State v. Barton,* 936 S.W.2d 781, 786 (Mo. banc 1996).

### A. Mercy Argument

■ The first particularized claim is that the prosecutor stated that the jury should impose the death penalty because that was "the only sentence [the jury could] impose to show justice and to show mercy to those people, to the people in the courtroom." Defense counsel objected to the statement and requested a mistrial. The trial court sustained the objection, but overruled the motion for a mistrial. The trial court then granted the prosecutor permission to rephrase the comment, but did not advise the jury that the objection had been sustained. Deck argues that the trial court's inaction violated his rights to due process of law, a fair trial, reliable sentencing, and to be free from cruel and unusual punishment as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 10, 18(a) and 21 of the Missouri Constitution.

Deck's argument focuses on the fact that the trial judge did not advise the jury that the objection had been sustained. However, Deck never requested that the trial court advise the jury that the objection was sustained, and, instead, the trial court took sufficient curative action on its own initiative and properly instructed the prosecuting attorney to rephrase his argument.

■ The need for curative action assumes, of course, that the prosecutor's mercy argument was improper in the first place. Prosecutors may discuss the concept of mercy in their closing arguments because mercy is a valid sentencing consideration, *Rousan,* 961 S.W.2d at 851, and in that connection may argue that the defendant should not be granted mercy. Prosecutors cannot, however, argue that the jurors may not lawfully grant a defendant mercy by imposing a life sentence. *Id.* In this case, the prosecutor did not argue that

the jurors could not lawfully grant mercy on appellant; thus, Deck's argument has no merit.

### B. Personalization

■ Deck also claims that the trial court erred in permitting the prosecutor to personalize his penalty phase closing argument. The prosecutor told the jury that while they were deliberating, they should "count out ten minutes and you think about how long that is and then think about somebody pointing a gun at your head at the same time." No objection was made to the prosecutor's argument; therefore, Deck requests plain error review.

■ Relief should rarely be granted on an assertion of plain error in closing argument. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). The reason, as this Court has explained, is that "in the absence of objection and request for relief the trial court's options are narrowed to uninvited interference with [the closing argument] and a corresponding increase of error by such intervention." *Id.* In order to be entitled to relief, appellant must make a substantial showing that manifest injustice will result if relief is not granted. *State v. Wood*, 719 S.W.2d 756, 759 (Mo. banc 1986).

Deck argues that the prosecutor's comment urging the jurors to put themselves in the place of the victim was the same kind of improper personalization this Court condemned in *State v. Storey*, 901 S.W.2d 886, 901 (Mo. banc 1995). In *Storey*, the prosecutor told the jurors to put themselves in the victim's place and then graphically described the crime to the jurors as if they were the victims. This Court concluded that the prosecutor's argument was improper because it "could only arouse fear in the jury," *id.*, and moreover, arguments that inflame and arouse fear in the jury are especially prejudicial when the death penalty is at issue. *Id.* (citing *State v. Tiedt*, 357 Mo. 115, 206 S.W.2d 524, 529 (Mo. banc 1947)).

The prosecutor's argument in this case is distinguishable from the prosecutor's argument in *Storey*. Here, the prosecutor's comments were brief and isolated and did not involve graphic detail, and as such, they did not result in manifest injustice. The point is denied.

### VIII. Reasonable Doubt Instruction

■ Deck claims that the trial court erroneously submitted instructions in both guilt phase and penalty phase by defining "proof beyond a reasonable doubt" with the words, "firmly convinced." Citing *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), Deck contends that this language allowed the jury to reach its decisions on both guilt and punishment based upon a level of proof less than that which is constitutionally mandated. This Court has consistently and repeatedly denied Deck's precise claim. The phrase "firmly convinced" is essentially synonymous with the phrase "beyond a reasonable doubt." *State v. Barnett*, 980 S.W.2d 297 (Mo. banc 1998), *cert. denied,* — U.S. —, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999); *State v. Jones*, 979 S.W.2d 171 (Mo. banc 1998), *cert. denied,* — U.S. —, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999); *State v. Johnson*, 968 S.W.2d 686 (Mo. banc 1998). The point is denied.

### IX. Independent Review under Section 565.035.3

Under section 565.035.3, RSMo 1994, this Court is required to determine:

1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and

3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

Having thoroughly reviewed the record, this Court is satisfied that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

With regard to statutory aggravating circumstances, the jury found: 1) that each murder was committed while the defendant was engaged in the commission of another unlawful homicide, section 565.032.2(2); 2) that the murders were committed for the purpose of receiving money or any other thing of monetary value, section 565.032.2(4); 3) that the murders were outrageously and wantonly vile, horrible, and inhuman in that they involved depravity of mind, section 565.032.2(7); 4) that the murders were committed for the purpose of avoiding a lawful arrest, section 565.032.2(10); 5) that the murders were committed while defendant was engaged in the perpetration of burglary, section 565.032.2(11); and 6) that the murders were committed while defendant was engaged in the perpetration of robbery, section 565.032.2(11). From this Court's review of the record, the evidence amply supports the statutory aggravators found by the jury.

Finally, the imposition of the death penalty in this case is clearly not excessive or disproportionate. The strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Deck's favor.

There are numerous Missouri cases where, as here, the death penalty was imposed on defendants who murdered more than one person. *See, e.g., State v. Johnson*, 968 S.W.2d 123 (Mo. banc 1998); *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993); *State v. Mease*, 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell*, 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan*, 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988); *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985).

In addition, a sentence of death has often been imposed when the murder involved acts of brutality and abuse that showed depravity of mind. *See, e.g., State v. Kinder*, 942 S.W.2d 313 (Mo. banc 1996); *State v. McMillin*, 783 S.W.2d 82 (Mo. banc 1990); *State v. Sidebottom*, 753 S.W.2d 915 (Mo. banc 1988); *State v. Walls*, 744 S.W.2d 791 (Mo. banc 1988); *State v. Lingar*, 726 S.W.2d 728 (Mo. banc 1987); *State v. Roberts*, 709 S.W.2d 857 (Mo. banc 1986).

This Court has also upheld the death sentence where the murder was committed in hopes of avoiding arrest or detection. *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997); *State v. Copeland*, 928 S.W.2d 828 (Mo. banc 1996); *State v. Richardson*, 923 S.W.2d 301 (Mo. banc 1996); *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994); *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993); *State v. Six*, 805 S.W.2d 159 (Mo. banc 1991); *State v. Kilgore*, 771 S.W.2d 57 (Mo. banc 1989); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Grubbs*, 724 S.W.2d 494 (Mo. banc 1987); *State v. Foster*, 700 S.W.2d 440 (Mo. banc 1985).

The death penalty imposed in this case is proportionate to the sentence imposed in similar cases.

## X.

For the foregoing reasons, the judgment is affirmed.

All concur.