

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED102338 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | 1422-CR02312-01 |
| | ) | |
| SHALIMAR STRONG, | ) | Honorable Thomas J. Frawley |
| | ) | |
| Respondent. | ) | Filed: April 7, 2015 |

### Introduction

This is an interlocutory appeal in which the State of Missouri (State) appeals the trial court's grant of Shalimar Strong's (Defendant) motion to suppress evidence of a gun seized by police officers from Strong. The State argues that the trial court erred in suppressing the evidence because officers seized the gun during a lawful detention. We reverse.

### Background

The State charged Defendant with unlawful use of a weapon (Count I) and unlawful possession of a firearm by a person who has been convicted of a felony (Count II), both of which arose after police found a gun in Defendant's pocket during a pat-down search. Prior to trial, Defendant filed a motion to suppress evidence of the gun, arguing

that police unlawfully detained Defendant and conducted the search without reasonable suspicion of criminal activity. The trial court held a hearing on Defendant's motion to suppress, and later a bench trial, during which it heard the following evidence.

On June 14, 2014, Officers Ryan Buscemi (Officer Buscemi) and Edward Gonzales (Officer Gonzales) were in uniform and on patrol in a marked police car in the Dutchtown and Gravois Park neighborhoods. Raymond Fields (Fields) was driving his car and pulled alongside the officers. Fields stated that his nephew told him that a man wearing a white tank top and blue jean shorts in the 3300 block of Keokuk had raised his shirt and shown a pistol sticking out of his pants to Fields's nephew and several other children. Officer Buscemi testified that he and Officer Gonzales decided to investigate because "information of somebody in possession of a firearm, especially in these neighborhoods, is very serious. We have a lot of gang activity, we have a lot of violent crime, robberies, so we take it very seriously when we're advised of somebody walking around with a firearm on their person."

When the officers arrived at 3300 Keokuk, they saw a man sitting on the steps wearing a white tank top and blue jean shorts, who they later identified as Defendant. As Officer Buscemi approached Defendant to conduct a field interview, Defendant's hand fell to the front right side by his pants pocket, "like he was concealing something or grabbing something that was right there." Officer Buscemi testified that based on the information they had received from Fields and Defendant's hand movement toward his pocket, he "had reason to believe [Defendant] had a firearm on his person." Officer Gonzales testified at trial that from his vantage point, when Defendant stood up, Officer Gonzales saw the handle of a gun in Defendant's right front pocket. Officer Buscemi and

2

Officer Gonzales drew their weapons and pointed them in Defendant's direction. Officer Buscemi told Defendant to put his hands in the air, and Defendant complied.

Officer Buscemi approached Defendant and handcuffed him for the safety of the officers. Officer Buscemi lifted up Defendant's shirt and saw a handgun sticking out of the right front pocket of Defendant's pants. Officer Buscemi seized the gun and handed it to Officer Gonzales, who rendered it safe. While Defendant was still handcuffed, the officers inquired into whether Defendant had a legal right to carry a concealed weapon. They determined Defendant did not and placed him under arrest.

Defendant testified at the suppression hearing that the gun the officers found was registered to Defendant's girlfriend. Defendant said that before the officers arrived, Defendant's girlfriend had phoned him and asked him to bring the gun outside to ensure she made it home safely from the bus stop. Defendant had also made a written statement at the police station after his arrest in which he said, "I have been threatened and approached several times by the people living next door, [and] I felt my life was on the line so I put the gun on my person to protect myself."

The trial court initially denied Defendant's motion to suppress. Later, the trial court rescinded its first order and granted the motion to suppress, concluding that the information Fields provided to the officers constituted an anonymous tip, and the officers failed to observe any corroborating evidence giving rise to a reasonable suspicion of any criminal activity before searching Defendant. This appeal follows.

## Standard of Review

We will reverse a trial court's ruling on a motion to suppress only if it is clearly erroneous. State v. Sund, 215 S.W.3d 719, 723 (Mo. banc 2007). We review "evidence

3

presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." State v. Grayson, 336 S.W.3d 138, 142 (Mo. banc 2011). We defer to the trial court's factual findings and credibility determinations, and we consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. Sund, 215 S.W.3d at 723. Whether police conduct violates the Fourth Amendment is a question of law, which we review *de novo*. Id.; see also State v. Pike, 162 S.W.3d 464, 472 (Mo. banc 2005) (stating same analysis applies to cases brought under Missouri Constitution as under United States Constitution).

Here, there is nothing in the record to suggest the trial court disbelieved Officer Buscemi's testimony from the suppression hearing or Officer Gonzales' testimony from the bench trial, as the court reiterated much of this testimony in its own findings of fact. See State v. Irvin, 210 S.W.3d 360, 363 n.3 (Mo. App. W.D. 2006). Rather, the trial court came to its conclusions as a matter of law, independent of any credibility determination. See id. Thus, our review is purely *de novo*.

## Discussion

The State's sole point on appeal is that the trial court clearly erred in granting Defendant's motion to suppress. The State argues that at the time the officers handcuffed Defendant and conducted a pat-down search, they had reasonable suspicion to believe Defendant was engaged in criminal activity, as well as a concern for the officers' safety. We agree.

The Fourth Amendment to the United States Constitution and article I, section 15 of the Missouri Constitution both guarantee the right of an individual to be free from

4

unreasonable searches and seizures. Grayson, 336 S.W.3d at 143 n.2 (same analysis applies under both state and federal constitutional provisions). Not every police encounter is a seizure; an officer may initiate a consensual encounter by approaching an individual to ask questions without detaining that person. State v. Johnson, 427 S.W.3d 867, 872 (Mo. App. E.D. 2014). In contrast, "[a] person is seized when the totality of circumstances surrounding the incident indicates that a reasonable person would have believed that he [or she] was not free to leave." Grayson, 336 S.W.3d at 143 (internal quotations omitted).

In the event the police detain a person in such a way that constitutes a seizure in terms of the Fourth Amendment, the question becomes whether such a detention was reasonable. Id. In the context of pat-down searches, as here, "the Fourth Amendment is not offended when a brief stop followed by a pat-down or frisk for weapons occurs and is based upon reasonable suspicion supported by articulable facts that the person stopped is engaged in criminal activity." State v. Carr, 441 S.W.3d 166, 169 (Mo. App. W.D. 2014) (citing Terry v. Ohio, 392 U.S.1, 30 (1968)). This kind of brief detention is known as a Terry stop.

Reasonable suspicion justifying such a stop can, under certain circumstances, be based on facts the officer did not personally observe; however, the totality of the circumstances must indicate that the information supplied to the officer is reliable. See State v. Miller, 894 S.W.2d 649, 652-53 (Mo. banc 1995); see also Alabama v. White, 496 U.S. 325, 328-29 (1990) (totality of circumstances test applicable to determine both probable cause and reasonable suspicion; noting "allowance must be made in applying them for the lesser showing required to meet [reasonable suspicion] standard"). In the

context of a tip from an informant, most often reasonable suspicion will arise only collectively from the tip and the officer's subsequent independent observation of corroborating evidence. Miller, 894 S.W.2d at 653.

Here, the trial court concluded that because the officers had no prior contact with Fields, the information Fields provided to the officers constituted an anonymous tip, requiring independent corroborating evidence before the officers could have reasonable suspicion justifying a Terry stop. See Grayson, 336 S.W.3d at 144 (quoting State v. Deck, 994 S.W.2d 527, 536 (Mo. banc 1999) ("a detention and search and seizure is unlawful if conducted solely on the basis of an anonymous tip")). The State argues that because Fields identified himself during an in-person encounter with the officers and provided context for the information he shared, Fields should be considered a citizen informant whose information is presumptively reliable. See State v. Long, 417 S.W.3d 849, 854 (Mo. App. S.D. 2014).

However, we need not determine here whether the officers could have relied solely on the information from Fields to justify a Terry stop, because they did not do so. Officer Buscemi testified that based on their knowledge of the prevalence of violent crime in the neighborhood, he and Officer Gonzales decided to investigate what Fields had told them. When they arrived at Defendant's residence, they approached him to conduct a field interview. At this point, the officer was pursuing a consensual encounter and there was no seizure. See Carr, 441 S.W.3d at 169 (officer's request to speak with defendant was not a Terry stop, therefore no need to determine whether anonymous tip alone provided reasonable suspicion); see also Deck, 994 S.W.2d at 535-36 (finding no

6

seizure when officer first approached car; seizure occurred only when officer ordered driver to sit up and display his hands and driver complied).

As the officers approached Defendant, whose clothes matched the description Fields had given, the officers saw Defendant move his hand toward his pocket, which was where Fields had told the officers that Defendant was carrying the gun. At this point, based on Defendant's hand movement as well as what Fields had told him, Officer Buscemi drew his weapon and told Defendant to put his hands in the air. Officer Gonzales confirmed at trial that Officer Buscemi did this right after Defendant stood up and moved his hand toward his pocket. Officer Gonzales also confirmed that he saw the gun handle. At that point, it is undisputed Defendant was not free to leave.

The trial court found the detention of Defendant was not justified even under these circumstances because Defendant was "not engaged in any observable criminal activity" before the officers detained him. The trial court found that despite the officers' belief that Defendant was reaching for a gun, the officers did not know whether Defendant had a legal right to conceal the gun until after they detained him. However, where an officer reasonably suspects a person is illegally concealing a weapon, Missouri courts have not required, and should not require, the officer to first make an inquiry into whether the person has a permit to conceal a weapon before performing a Terry stop and pat-down search. See State v. Norfolk, 366 S.W.3d 528, 534 (Mo. banc 2012) (defendant's adjustment of his waistband after making eye contact with officer in area where several robberies recently occurred was "movement that [officer's] experience and training reasonably caused her to believe was the illegal concealment of a weapon"); Carr, 441 S.W.3d at 171 (when officer stated he wanted to speak with defendant,

7

defendant's turning away and reaching toward hip area gave rise to "reasonable suspicion that [defendant] was armed and engaged in criminal activity[,] i.e. [defendant] made physical gesture leading the [o]fficer to believe [defendant] was reaching for a weapon").

An officer does not have to be certain criminal activity has occurred, rather the totality of the circumstances inform whether the officer's suspicion is reasonable. Johnson, 427 S.W.3d at 873 (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)). Then, the officer is permitted to take limited steps to confirm or dispel any reasonable suspicion. State v. Waldrup, 331 S.W.3d 668, 674 (Mo. banc 2011) (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)) (during Terry stop police may ask "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicion").

Here, by the time the officers drew their weapons, the collective information from Fields' tip as well as the officers' observations of Defendant formed a basis for their reasonable suspicion that Defendant was armed and engaged in criminal activity. See Grayson, 336 S.W.3d at 144 (police may "properly consider [information from tip] if it is in conjunction with other, independent corroborative evidence suggestive of criminal activity"); Norfolk, 366 S.W.3d at 534 (noting "police officers are permitted to make use of all of the information available to them" when forming reasonable suspicion, including "their own experience and specialized training"). Fields told the officers a person wearing what Defendant was wearing had raised his shirt and had shown a gun to several children, conduct that could be criminal even if the person had a permit to carry a concealed weapon.[1] The officers went to the location supplied by Fields and found

---

[1] For example, depending on the circumstances, showing a gun to a group of children could have been evidence either of endangering the welfare of a child, or of unlawful use of a weapon under Section

8

Defendant, who, immediately upon the officers' approach, stood up and moved his hand toward his pocket, where Fields had said the gun was concealed. The officers were in a high-crime area, and Officer Buscemi testified that the hand movement he observed Defendant make suggested concealment of a weapon. Officer Gonzales could see the weapon. Under the circumstances, at the time the officers drew their weapons, reasonable suspicion supported by articulable facts existed to justify a Terry stop.

Therefore, the officers were justified in detaining Defendant in a manner reasonable to ensure officer safety and for a reasonable period of time in order to dispel or confirm their suspicion that Defendant was illegally concealing a weapon. See Johnson, 427 S.W.3d at 873-74 (discussing permissible actions of officers during Terry stop). The officers handcuffed Defendant and performed a pat-down search for weapons for the officers' safety. See id.; Carr, 441 S.W.3d at 169. Immediately upon finding the gun, they inquired into whether Defendant had a legal right to conceal it. Once this inquiry confirmed the officers' suspicion that Defendant was carrying the gun illegally, they arrested him.

Given these circumstances, the officers' discovery of the gun was not part of an illegal search. Thus, the trial court's suppression of this evidence was clearly erroneous. Point granted.

---

571.030.1(4), RSMo. (Supp. 2013) (exhibiting deadly weapon in angry or threatening manner). Thus, the officers were justified in investigating the circumstances to see whether Defendant's conduct was in fact criminal in this instance.

9

## Conclusion

The trial court's order granting Defendant's motion to suppress is reversed.

_[signature]_

Gary M. Gaertner, Jr., Judge

Kurt S. Odenwald, P. J., concurs.
Robert G. Dowd, Jr., J., concurs.

10