**STATE of Missouri, Respondent/Cross–Appellant,**

v.

**Belinda WILLIAMS, Appellant/Cross–Respondent.**

**No. 73347.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 29, 1998.

has been formed, before the contract becomes effective." *Morgan v. City of Rolla*, 947 S.W.2d

837, 840 (Mo.App.1997).

Craig A. Johnston, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. Jill C. LaHue, Asst. Atty. Gen., Jefferson City, for Respondent.

SIMON, Presiding Judge.

Belinda Williams (defendant) appeals the judgment entered on her conviction by a jury of two counts of forgery pursuant to section 570.090 RSMo 1994 (all further references shall be to RSMo 1994 unless otherwise noted), for which she was sentenced as a prior and persistent offender to two concurrent terms of seven years' imprisonment, with credit granted for time while on bond. State of Missouri (State) appeals the granting of the time credit.

Defendant filed a motion to dismiss State's appeal, arguing that State has no right to appeal in this case. The motion was ordered taken with the case. We deny the motion.

On appeal, defendant contends that the trial court "erred and plainly erred" in overruling her motion to suppress evidence and admitting into evidence items seized from her by police because those items were the fruit of an unlawful search and seizure. State contends that the trial court erred in granting defendant credit for time while on bond because credit can be granted only for time spent in confinement and because jurisdiction to determine jail time credit is vested in the Department of Corrections and not the sentencing court. We affirm in part and reverse and remand in part with directions.

The record, viewed in a light most favorable to the trial court's ruling on the motion to suppress, reveals that on October 3, 1996, Susan Blaylock, a white woman, went to Northwest Plaza in St. Louis County, Missouri, to do Christmas shopping. At some time between 10:00 and 11:30 a.m., she entered Lady Foot Locker, met store manager Dervon Nash, with whom she interacted for approximately forty minutes, and bought some shoes using her First Community Credit Union Visa Card. She used that card because her other cards "were at their limit." At approximately noon she went to the restroom at J.C. Penney, where someone took her maroon, oblong wallet from her purse. She went to the security department to report her missing wallet and gave a description of it to the police. She had not given anyone permission to use any of her credit cards in her purse or to sign her name.

Later that afternoon, a black woman entered the Lady Foot Locker, met Nash, requested several different types of merchandise of various sizes, and attempted to purchase the merchandise without trying anything on. When she presented a credit card, Nash's computer screen "sa[id] there's no authorization." The woman presented a second card which "[d]id not go through." Finally, she gave him a third card, a Commerce Bank Visa Card, which "went through." Nash checked the back of the third card to ensure that it had a signature and noticed that he had seen the name on the card during an earlier transaction that day. He "just knew something wasn't right," so he asked the woman for identification. She stated that she did not have any. When Nash compared the signature on the card, "Susan Blaylock," to the signature which the woman had written on the transaction receipt, "Susan Blaylock," he found that "the signatures were really close," but he "just knew that it just didn't sound right." Nevertheless, he returned the card to the woman, who left the store with the merchandise.

Nash told another employee, "[Y]ou need to call security." Nash then attempted to "keep an eye" on the woman who had just left the store. After seeing her walk away from an ATM machine, he saw a security officer in the mall and "jogged down there, to just get his attention to let him know" that a customer had used a credit card that was not hers. The officer asked Nash, "How do you know it's not hers?" Nash responded, "I had a customer in my store earlier, you know, who had the same charge." Because Nash no longer could see the woman, the officer

asked for a description of her. Nash described her as a "heavier set" black female wearing a green sweatshirt and black sweatpants. The officer used a walkie-talkie to report the information.

Nash and the security officer looked for the woman in other stores in the mall but could not find her. A St. Ann police officer arrived, asked Nash for another description of the woman, and asked if that description matched the one Nash had given earlier to the mall security officer. When Nash answered yes, the police officer told him to return to his store. Approximately twenty to thirty minutes later, a mall security officer went to Nash's store and asked him to identify someone in the center court of the mall. Nash indicated that the person at the center court was not the woman he had described. The security officer, the St. Ann police officer, and Nash then stood in the center court and talked to each other.

At approximately the same time, St. Ann Detective John Lee and his captain were inside the Eddie Bauer store near the center court. They were at Northwest Plaza to assist a uniform division which "was looking for a lady possibly with some stolen credit cards." While buying some Eddie Bauer cologne at approximately 1:10 p.m., Lee received a radio transmission regarding "a Black female about five-foot-nine, a hundred ninety pounds, green sweatshirt, black pants" whom police sought for "fraudulent use of a credit card."

About five minutes after Nash joined the officers in the center court, he saw the woman he had described leave Father & Son, a shoe store for men near the center court, with a Lady Foot Locker bag. This sighting occurred approximately one hour after Nash had seen the woman in his store. He told the officers that she was the woman he had described. Detective Lee and his captain, who from their position also had seen the woman leave Father & Son, joined the other officers. All of the officers then approached her, "escorted her away from the mall traffic," and told Nash to return to his store.

The woman held a yellow Lady Foot Locker bag and a purse in her right hand and a white Father & Son bag in her left hand. When the officers asked her for identification, she opened her purse and produced a wallet containing identification for Belinda Williams. Lee noticed that defendant had three wallets in her purse. Thinking that having three wallets "was odd," and recalling information he had received earlier about a stolen maroon wallet, he noticed that a wallet inside defendant's purse matched the description he had received. He seized the wallet from the purse and opened it to reveal Susan Blaylock's driver's license and ten cards belonging to Susan Blaylock. He told defendant that she was under arrest for possession of stolen property. As defendant turned around, Lee told her to stop because he noticed a "bulge" in the left rear pocket of her black pants. He seized a Father & Son sales receipt, a Father & Son credit card receipt bearing the signature "Susan Blaylock," and a Citizen's Bank MasterCard, J.C. Penney charge card, Discover Card, and First Community Credit Union Visa Card, all having the name of Susan Blaylock on them. The two receipts from Father & Son showed that a transaction had occurred there at 1:15 p.m. on October 3, 1996. Approximately ten minutes later, a St. Ann police officer asked Nash to complete a police report and to give the officer the "white copy" of the Lady Foot Locker credit card receipt, dated October 3, 1996 at 12:56 p.m., that defendant had signed in Susan Blaylock's name.

Prior to trial, defendant filed a motion to suppress evidence, arguing that none of her actions at Northwest Plaza warranted suspicion for a search or arrest, that she did not consent to the search of her person or to the seizure of her possessions, and that the police officers conducted an unlawful search in that they lacked probable cause. The court took this motion, as well as another motion to suppress Nash's identification of defendant, with the case. During the course of the trial, defendant objected to the admission of the Lady Foot Locker credit card receipt "as to chain of custody," did not object to the admission of the Father & Son sales receipt and credit card receipt, and objected to the admission of Blaylock's credit cards as to "adequate foundation." The court overruled her objections and her motions.

At the close of State's evidence, which included the testimony of Susan Blaylock, Dervon Nash, and Detective Lee, defendant filed a motion for acquittal, which was denied. The jury convicted her of two counts of forgery and she was sentenced as a prior and persistent offender to two concurrent terms of seven years' imprisonment. She requested credit for time while on bond, which the trial court granted. Defendant then filed a motion for acquittal or in the alternative for new trial, arguing that the court incorrectly ruled on her motion to suppress evidence. The trial court denied her motion.

In her sole point on appeal, defendant contends that the trial court "erred and plainly erred" in overruling her motion to suppress evidence and admitting into evidence items seized from her by police because those items were the fruit of an unlawful search and seizure.

■ Initially, we note that defendant did not object to the admission of any evidence on the basis of an unlawful search and seizure. To preserve a claim of error, a party must state a specific basis for an objection and, on appeal, cannot change or broaden an objection beyond that made before the trial court. *State v. Pierce*, 932 S.W.2d 425, 430 (Mo.App. E.D.1996). Because defendant failed to object to the admission of the evidence on the basis of an unlawful search and seizure, she failed to preserve her claim of error. Nevertheless, she requests plain error review which, under Rule 30.20, is limited to review for errors affecting substantial rights when manifest injustice or miscarriage of justice has resulted.

■ An investigative stop is permitted under the Fourth Amendment when a law enforcement officer is able to point to specific and articulable facts which, taken with rational inferences from those facts, create a reasonable suspicion that criminal activity has occurred, even if the officer lacks probable cause. *State v. Rushing*, 935 S.W.2d 30, 32 (Mo.banc 1996), *citing Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968).

■ Here, the record reveals the following facts: (1) Susan Blaylock entered Lady Foot Locker, talked to manager Nash for about forty minutes, and used a First Community Credit Union Visa Card to purchase merchandise; (2) Blaylock went to the restroom at J.C. Penney, where someone stole her wallet from her purse; (3) defendant entered Lady Foot Locker, selected various items of merchandise without trying them on, unsuccessfully presented two credit cards, successfully presented Susan Blaylock's Commerce Bank Visa Card, claimed that she did not have identification when Nash asked for it, and purchased the merchandise by signing Susan Blaylock's name on the credit card receipt; (4) Nash recalled seeing Susan Blaylock's name earlier, contacted a mall security officer to report that a customer had just used a credit card that was not hers, and described defendant as a "heavier set" black female wearing a green sweatshirt and black sweatpants; (5) the security officer used a walkie-talkie to report the information; (6) St. Ann police officers arrived at the mall after receiving a call regarding stolen credit cards; (7) Nash spotted defendant leaving the Father & Son shoe store while carrying a Lady Foot Locker bag; (8) officers stopped defendant and asked her for identification. On the basis of these facts, we cannot say that the officers, upon stopping defendant in the center court, lacked a reasonable suspicion that criminal activity had occurred. Therefore, under the standard enunciated in *Terry*, the officers made a valid stop.

We now examine the events that transpired following that stop: (1) As defendant opened her purse and retrieved a wallet containing her identification, Detective Lee plainly saw into her purse and noticed that she had three wallets, one of which matched a description he had received earlier about a stolen maroon wallet; (2) Lee seized the wallet and discovered that it contained Susan Blaylock's identification and ten cards belonging to Susan Blaylock.

■ As our Supreme Court stated in *State v. Blankenship*, 830 S.W.2d 1, 14 (Mo. banc 1992), officers may seize evidence without a search warrant when (1) the evidence is observed in plain view while the officer is in a

place where he has a right to be; (2) the discovery is inadvertent; and (3) it is apparent to the police that they have evidence before them. Here, Detective Lee observed the wallet in plain view and, as we previously determined, had a right to stop defendant in the center court and ask her for identification. He discovered the wallet inadvertently as defendant reached into her purse. Finally, he recognized that the wallet constituted evidence based upon his recall of the description of the stolen maroon wallet. Therefore, Lee lawfully seized the wallet.

We next examine the events that followed Lee's seizure of Blaylock's wallet: (1) officers arrested defendant for possession of stolen property; (2) as defendant turned around, Lee told her to stop because he noticed a "bulge" in the left rear pocket of her black pants; (3) Lee seized a Father & Son sales receipt, a Father & Son credit card receipt bearing the signature "Susan Blaylock," and four credit cards having Susan Blaylock's name on them.

■ As the Western District observed in *State v. Malone*, 951 S.W.2d 725, 729 (Mo.App. W.D.1997), pursuant to a valid arrest, an officer may search the defendant's person and the area within the defendant's immediate control and may seize items found pursuant to a search incident to arrest if the items have evidentiary value in connection with the crime for which the suspect is arrested. Here, Lee validly arrested defendant for possession of stolen property after discovering Blaylock's wallet in defendant's purse. Under *Malone*, he could search defendant's person and seize the receipts and credit cards found during that search because the search occurred incident to arrest and because the seized items constituted evidence connected to the crime for which Lee arrested defendant.

Having reviewed the record for plain error by the trial court, we fail to find that manifest injustice or miscarriage of justice has resulted from the decision to overrule defendant's motion to suppress evidence and admit into evidence items seized from her by police. Point denied.

In its sole point on appeal, State contends that the trial court erred in granting defendant credit for time while on bond because credit can be granted only for time spent in confinement and because jurisdiction to determine jail time credit is vested in the Department of Corrections and not the sentencing court.

■ Initially, we consider two preliminary matters. First, defendant argues that State has no right of appeal. Section 547.200.2, in pertinent part, provides that "[t]he state, in any criminal prosecution, shall be allowed an appeal in the cases and under the circumstances mentioned in section 547.210 [concerning insufficient indictment or information] and in all other criminal cases except in those cases where the possible outcome of such an appeal would result in double jeopardy for the defendant." The Double Jeopardy Clause provides that no person shall "be subject for the same offence [sic] to be twice put in jeopardy of life or limb." This provision protects defendant from subsequent prosecutions and multiple punishments for the same offense after an acquittal or conviction. *State v. Scott*, 933 S.W.2d 884, 887 (Mo.App. W.D.1996). By appealing the trial court's granting of credit for time while on bond, State does not place defendant in jeopardy of a second prosecution for the crime of forgery. Likewise, State does not place her in jeopardy of a second punishment for that crime. Instead, State simply seeks a determination whether the trial court correctly granted her credit against her sentence for time while on bond. Therefore, State may appeal the trial court's decision.

■ Second, defendant contends that State waived its claim of error by failing to make a specific objection at the sentencing proceeding. We disagree. Immediately after the trial court granted defendant credit, State argued that the credit concerned "time that she was out on bond free, not jail time that she's been serving" and asked, "Is there even statutory authorization for that?" Such an objection, which the record shows State offered at the earliest possible opportunity, essentially contends that the court lacked authority to grant such a credit.

Having disposed of defendant's arguments regarding State's right to appeal, we now

review State's point. Section 558.031, in pertinent part, provides as follows:

1. A sentence of imprisonment shall commence when a person convicted of a crime in this state is received into the custody of the department of corrections or other place of confinement where the offender is sentenced. Such person shall receive credit toward the service of a sentence of imprisonment for all time in prison, jail or custody after the offense occurred and before the commencement of the sentence, when the time in custody was related to that offense, except:

(1) Such credit shall only be applied once when sentences are consecutive;

(2) Such credit shall only be applied if the person convicted was in custody in the state of Missouri, unless such custody was compelled exclusively by the state of Missouri's action; and

(3) As provided in section 559.100, RSMo.

Section 559.100, in pertinent part, provides that "[t]he circuit court may, in its discretion, credit any period of probation or parole as time served on a sentence."

 The plain language of these two sections, taken together, limits credit toward the service of a sentence of imprisonment to time in prison, jail, or custody or periods of probation or parole. Credit granted for time while on bond does not comport with section 558.031. As the Western District has stated, the defendant is not entitled to credit for time while free from custody on bail. *Mashek v. State ex rel. Mitchell*, 940 S.W.2d 1, 3 (Mo.App. W.D.1997). A salient purpose of the enactment of section 558.031 is to ensure that an indigent accused who awaits trial shall not serve a longer term for the same sentence than an accused able to meet bail to avoid confinement before trial and sentence. *Id.* Indeed, even a defendant on bond subject to conditions that restrict him to his home during nighttime hours and require daily telephone reporting to the sheriff is not eligible for credit because such restrictions do not amount to serious curtailment of freedom of movement and personal liberty and do not constitute the substantial equivalent of jail. *Heitman v. State*, 622 S.W.2d 760, 761 (Mo.

App. W.D.1981). Thus, the trial court erred in granting defendant credit for time while on bond. We reverse and remand as to the sentence, with directions to the trial court to sentence defendant in accordance with this opinion. We affirm the judgment in all other respects.

Judgment affirmed in part and reversed and remanded in part with directions.

CRANE and MOONEY, JJ., concur.