**STATE of Missouri, Appellant,**

v.

**Mike A. TACKETT, Respondent.**

**No. WD 57545.**

Missouri Court of Appeals,
Western District.

Feb. 8, 2000.

Jeremiah W. (Jay) Nixon, Atty. Gen., Timothy W. Anderson, Asst. Atty. Gen., Jefferson City, for appellant.

John H. Edmiston, Warrensburg, for respondent.

Before: SMART, P.J., and ELLIS and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

The State appeals, pursuant to § 547.200.1(3), RSMo Supp.1997,[1] from the interlocutory order of the Circuit Court of Clay County suppressing evidence in this case, in which the respondent, Mike A. Tackett, stands charged with the class D felony of "creation of a controlled substance," in violation of § 195.420.

The State raises two points on appeal. It claims that the trial court erred in sustaining the respondent's pretrial motion to suppress evidence, suppressing twelve boxes of Equate brand antihistamines seized in a search of a vehicle in which the respondent was a passenger, because there was substantial evidence establishing that the search and seizure were lawful in that: (1) the initial stop of the vehicle was justified on the basis that the officer effectuating the stop had reasonable suspicion to believe that the respondent was engaged in criminal activity, or on the alternative basis, that he had observed a traffic violation; and (2) the search and seizure were incident to a lawful arrest in that, after the stop was effectuated, the officer had probable cause to arrest the respondent for the crime of creation of a controlled substance, methamphetamine, § 195.420.

We affirm.

### Facts

On April 16, 1998, Detective Clayton O'Donnell (O'Donnell) of the Higginsville Police Department received an anonymous tip from an employee of the local Wal–Mart, informing him that three males had purchased the maximum amount of antihistamine allowed by the store, six boxes per customer. The tipster further informed O'Donnell that the three men left

---

**1.** All statutory references are to RSMo 1994, unless otherwise indicated.

the store in a blue Camaro and advised him of the license number.

Having received the anonymous tip, O'Donnell proceeded to Wal–Mart and radioed another officer to be on the lookout for the blue Camaro. While driving to Wal–Mart, O'Donnell observed three men in a blue Camaro driving in the opposite direction. The license matched the license number given to him by the tipster. While turning around to follow, O'Donnell again radioed the other officer, requesting that he locate the suspect vehicle.

Having caught up to the suspect vehicle, rather than stopping it immediately, O'Donnell followed to see what the suspects were going to do with the antihistamines. As he followed in his marked police car, the passengers in the vehicle began "looking around quite a bit." The Camaro at some point turned right into the parking lot of a convenience store, at which time O'Donnell noticed that the right turn signal was not working properly. Having checked the plates to a Knob Noster address, O'Donnell pulled around the block in order to be in position to intercept the vehicle before it got to Interstate 70. He radioed the other officer about the location of the suspect vehicle and advised him "to cover the other directions out of [the convenience store]." He also contacted another officer at home about the situation. After a few minutes had elapsed, O'Donnell proceeded back to the convenience store and saw the blue Camaro headed in the opposite direction, requiring him to turn around. As he turned around, he radioed one of the other officers to stop the vehicle.

The vehicle was subsequently stopped pursuant to O'Donnell's direction. Having arrived at the scene, O'Donnell approached the vehicle and asked the two male passengers to exit the vehicle, at which time he searched them for weapons and found none. One officer was assigned to stay with the driver and another with the respondent, who was sitting in the front passenger seat when the vehicle was stopped. O'Donnell spoke with the passenger located in the back seat, who identified himself as Michael Ford. O'Donnell advised Ford about the reason for the stop, his concerns about the quantity of antihistamines purchased and whether they were purchased to manufacture methamphetamines. Ford "claimed that he'd been in prison and had no knowledge of methamphetamine or what it was used or what it was made with or anything else." He also told O'Donnell that "he'd been working in Knob Noster that morning working on the car" and also had been in Warrensburg. When he was asked why they were in Higginsville, he said, "He didn't really know, he was just riding with them."

After questioning Ford, O'Donnell asked the officer in charge of the respondent what he had learned from his interrogation of him. He reported that the respondent claimed that "he didn't know anything illegal in the car" and that "there were no drugs or anything else in the car." O'Donnell then proceeded to question the driver, Jesse Tackett, the respondent's brother. Jesse Tackett, like Ford, denied any criminal wrongdoing. O'Donnell then asked permission to search the vehicle, which Jesse Tackett first denied and then allowed, saying, "Yeah, go ahead, there's nothing in there anyway."

Upon searching the vehicle, O'Donnell found twelve boxes of Equate antihistamines along with two Wal–Mart receipts, showing two purchases of six boxes each at the local store. The boxes were in plain view on the back seat of the vehicle. They were in a semi-clear Wal–Mart plastic bag.

After discovering the antihistamines, O'Donnell called the Lafayette County prosecuting attorney to determine how he should proceed. He was advised that, although there was not enough to convict the suspects for the crime of creation of a controlled substance, he should interrogate them further to determine what they in-

tended to do with the antihistamines. The suspects were then arrested and transported to the local police department. There, all three were *Mirandized* and further interrogated. All three denied involvement in any criminal activity. As to the purchase of the antihistamines, the respondent told O'Donnell that they had purchased them for allergies. O'Donnell did not observe any signs of allergy suffering as to the respondent or the other two suspects.

After being incarcerated for some time, the respondent, in an attempt to prevent Ford, who was on parole from prison, from getting into any trouble, agreed to talk further. At this point, "[i]t had already been mentioned to him that Dan Criteman from the Narcotics Task Force was coming up and that there was the possibility of working as an informant." The respondent then told O'Donnell that he and his brother intended to "take [the antihistamines] to a gentleman in Knob Noster in a trailer park and could trade that for methamphetamine. Or they, this gentleman would double their money."

From the record provided, it is unclear what took place immediately after the respondent's admissions to O'Donnell. It does not reflect whether he remained in jail or was bonded out. It does reflect that on June 15, 1998, he was indicted in Lafayette County for the class D felony of creation of a controlled substance, in violation of § 195.420.2, and a warrant issued for his arrest on June 23, 1998. He was subsequently arrested on September 11, 1998. He was arraigned on September 28, 1998, and pled not guilty. On October 7, 1998, John H. Edmiston filed his entry of appearance on behalf of the respondent, along with a motion for a change of judge, which was sustained on October 19, 1998.

On October 29, 1998, the Honorable Larry D. Harman, Circuit Judge for the Seventh Judicial Circuit, was assigned to the case by the Missouri Supreme Court. On November 4, 1998, a change of venue was granted to Clay County, comprising the Seventh Judicial Circuit. On June 18, 1999, a motion to suppress the antihistamines was filed by the respondent, a hearing held, and the motion sustained.

This interlocutory appeal follows.

## Standard of Review

 Review of a trial court's decision as to a motion to suppress evidence is limited to a determination of whether there is substantial evidence to support its decision. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo.*banc*), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *State v. Owsley,* 959 S.W.2d 789, 794 (Mo. banc 1997); *State v. Simmons,* 955 S.W.2d 752, 761 (Mo. banc 1997). "The trial court's ruling on a motion to suppress is reversed only if it is clearly erroneous. The trial court's ruling is clearly erroneous if we are left with a definite and firm belief a mistake has been made." *State v. Leavitt,* 993 S.W.2d 557, 560 (Mo.App.1999) (citations omitted). "In reviewing the trial court's ruling on a motion to suppress, the facts and any reasonable inferences arising therefrom are to be viewed in a light most favorable to the ruling of the trial court." *State v. Carter,* 955 S.W.2d 548, 560 (Mo. banc 1997). "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses. As in all matters, a reviewing court gives deference to the trial court's factual findings and credibility determination, but reviews questions of law de novo." *Rousan,* 961 S.W.2d at 845 (citation omitted). "[T]he issue of whether the Fourth Amendment has been violated is a legal question we review *de novo.*" *Leavitt,* 993 S.W.2d at 560.

## I.

In Point I, the State claims that the trial court erred in sustaining the respondent's pretrial motion to suppress the twelve boxes of antihistamines seized from the vehicle in which he was a passenger because the evidence established that the initial

stop of the vehicle was lawful. Specifically, the State contends that the stop was lawful in that there was substantial evidence establishing that: (1) the officer who stopped the vehicle had a reasonable suspicion to believe that the respondent was, at the time, engaged in a criminal activity, the creation of methamphetamine; and (2) the officer had observed a traffic violation. Premised on the lawfulness of the stop, the State claims, in Point II, that the trial court erred in sustaining the respondent's motion to suppress because the search of the vehicle and seizure of the antihistamines were lawful in that the evidence established that they were incident to a lawful arrest of the respondent for the offense of creation of methamphetamine. Because Point II is simply an extension of Point I and dependent on its outcome, we will treat them as one.

▪ "The Fourth Amendment of the United States Constitution preserves the right of the people to be secure against unreasonable searches and seizures. Missouri's constitutional 'search and seizure' guarantee, article I, section 15, is co-extensive with the Fourth Amendment." *State v. Deck*, 994 S.W.2d 527, 534 (Mo.*banc*), *cert. denied*,— U.S. ——, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). As a general principle of the Fourth Amendment, " 'searches conducted outside of the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.' " *Leavitt*, 993 S.W.2d at 560–61 (*quoting State v. Hutchinson*, 796 S.W.2d 100, 104 (Mo.App.1990)); *Deck*, 994 S.W.2d at 534. The State has the burden to justify a warrantless search and seizure by demonstrating that they fall within an exception to the warrant requirement. *Deck*, 994 S.W.2d at 534 (*citing State v. Villa–Perez*, 835 S.W.2d 897, 902 (Mo. *banc* 1992)).

▪ Our appellate courts have recognized numerous exceptions to the warrant requirement of the Fourth Amendment. A warrant is not required for:

(1) a search incident to a lawful arrest; (2) a seizure of items falling within the plain view doctrine; (3) a search of an automobile where probable cause exists to believe that it contains a substance which offends the law; or (4) a protective search by officers for weapons upon less than probable cause to arrest.

*Leavitt*, 993 S.W.2d at 561. In addition, "the Fourth Amendment does not prohibit a so-called '*Terry*' stop—a stop followed by a 'frisk' or 'pat-down' for weapons—that is based on reasonable suspicion supported by articulable facts that the person stopped is engaged in criminal activity." *Deck*, 994 S.W.2d at 534. Such a stop is named after the decision of the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), establishing its lawfulness. "*Terry* 'stop and frisk' principles have been extended to motor vehicle stops so that police who have the requisite reasonable suspicion may conduct a 'search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden....' " *Id.* (*quoting Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1220 (1983)). "[A] passenger in a vehicle is entitled to challenge the validity of an initial stop." *State v. Duncan*, 879 S.W.2d 749, 751 (Mo.App.1994) (*citing United States v. Portwood*, 857 F.2d 1221, 1222 (8th Cir.1988), *abrogated on other grounds by Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). Further, a vehicular stop for an observed traffic violation does not violate the Fourth Amendment, provided it does not extend " 'beyond the time reasonably necessary to effect its initial purpose.' " *State v. Slavin*, 944 S.W.2d 314, 317–18 (Mo.App.1997) (*quoting State v. Stevens*, 845 S.W.2d 124, 128 (Mo.App. 1993)).

As claimed in Point I, the State relies on the last two exceptions cited to justify the

warrantless stop of the vehicle in which the respondent was residing as a passenger. However, in Point II, to justify the actual seizure of the antihistamines, it relies on the exception that legitimizes a warrantless search and seizure, which are incident to a lawful arrest. Specifically, it contends that there was probable cause to arrest the respondent for the crime for which he now stands charged, under § 195.420, creation of a controlled substance, methamphetamine. Hence, unless the evidence was sufficient to establish probable cause to arrest the respondent for this offense, the seizure of the antihistamines, the exception relied on for seizure of the challenged evidence, would not lie.

 "An officer must have probable cause to make an arrest" without a warrant. *State v. Kinkead,* 983 S.W.2d 518, 519 (Mo. banc 1998); *State v. Clayton,* 995 S.W.2d 468, 477 (Mo.*banc* ), *cert. denied,*—— U.S. ——, 120 S.Ct. 543, 145 L.Ed.2d 421 (1999). In the case of a lawful arrest, " 'a *full search* of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a "reasonable" search under that Amendment.' " *State v. Esquivel,* 987 S.W.2d 481, 484 (Mo.App.1999) (emphasis added) (*quoting United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 441 (1973)). Thus, "pursuant to a valid arrest, an officer may search the defendant's person and the area within the defendant's immediate control and may seize items found pursuant to a search incident to arrest if the items have evidentiary value in connection with the crime for which the suspect is arrested." *State v. Williams,* 978 S.W.2d 454, 459 (Mo.App. 1998) (*citing State v. Malone,* 951 S.W.2d 725, 729 (Mo.App.1997)).

" 'The type of facts needed to determine probable cause [to arrest] are found in the definition of the substantive offense and in case law dealing with the sufficiency of the evidence to convict of the substantive offense.' " *Mayberry v. Director of Revenue,* 983 S.W.2d 628, 631 (Mo.App.1999) (*quoting Wilcox v. Director of Revenue,* 842 S.W.2d 240, 242 (Mo.App.1992)). In this respect, § 195.420, the statute under which the respondent is charged, provides:

1. It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400 with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of sections 195.005 to 195.425.

2. A person who violates this section is guilty of a class D felony.

§ 195.420. With respect to the chemical-in-possession requirement of the statute, the respondent is alleged by the State to have "possessed pseudoephedrine," which chemical is commonly found in over-the-counter antihistamines, such as those allegedly seized from the respondent, and is listed at § 195.400.2(20), RSMo Supp.1997.

 In addition to the chemical-in-possession requirement, for a person to be in violation of § 195.420, the statute also requires, by its express terms, that the person have an intent to "create" a controlled substance. Without this intent requirement, mere possession of the listed chemicals, including pseudoephedrine, which would otherwise be lawful, would be unlawful under the statute. As such, in this case, even assuming that the antihistamines seized were found pursuant to a lawful search, they were not subject to a warrantless seizure as contraband. They could only have been seized if there was probable cause to believe that the respondent was engaged in the crime of creation of a controlled substance, and the antihistamines were evidence of the same. The issue then for us to decide, in determining the lawfulness of the challenged seizure, is whether there was probable cause to believe that, at the time of his arrest, the respondent not only possessed the antihistamines, but did so with an intent to create the controlled substance of methamphetamine.

 " 'Probable cause to arrest exists when the arresting officer's knowledge of the particular facts and circumstances is sufficient to warrant a prudent person's belief that a suspect has committed an offense.' " *Clayton*, 995 S.W.2d at 477 (*quoting State v. Tokar*, 918 S.W.2d 753, 767 (Mo. *banc* 1996)). "There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case." *Id.* " 'Furthermore, probable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest[.]' " *Id.* (*quoting State v. Mayweather*, 865 S.W.2d 672, 675 (Mo.App.1993)). "Probable cause [to arrest] does not mean absolute certainty." *State v. Closterman*, 687 S.W.2d 613, 618 (Mo.App.1985). As such, "[t]o establish probable cause [to arrest] '[m]uch less evidence than is required to establish guilt is necessary.' " *State v. Dixon*, 655 S.W.2d 547, 553 (Mo.App.1983) (*quoting State v. Dodson*, 491 S.W.2d 334, 336 (Mo. *banc* 1973)), *overruled on other grounds by State v. Carson*, 941 S.W.2d 518, 520, 523 (Mo. *banc* 1997).

 The State contends that, at the time of the respondent's arrest, the officers had probable cause to believe that he had committed the crime of creation of a controlled substance, methamphetamine. In this regard, the record would reflect that the officers knew the following circumstances at the time of the respondent's arrest:

1. The respondent was a passenger in the vehicle that was stopped and contained two other male subjects, including his brother, the driver. A license check, prior to stop, revealed that the vehicle was registered to an individual at a Knob Noster address.

2. The stop occurred *after* the vehicle pulled out of a convenience store parking lot. *Prior* to pulling into the convenience store, sometime earlier, the passengers "began looking around quite a bit," while being followed by a marked police car.

3. O'Donnell learned that prior to going to Higginsville, the three subjects had been in Knob Noster; Whiteman Air Force Base, so one of the suspects could apply for a job; and Warrensburg, which had a Wal–Mart. No reason was given by the subjects as to their purpose for being in Higginsville, other than just riding around.

4. The driver gave O'Donnell permission to search the vehicle, after first denying it. O'Donnell found, in plain view on the back seat, a bag of twelve boxes of Equate antihistamines with two receipts from the Higginsville Wal–Mart, each showing a purchase of six boxes of Equate, the store-imposed limit for purchases of antihistamines by any one individual.

5. O'Donnell knew that antihistamines are commonly used by allergy sufferers and contain ephedrine or pseudoephedrine, necessary ingredients to the creation of methamphetamines. None of the subjects were observed to be suffering from allergies.

As to the reasons given by O'Donnell at the suppression hearing for the arrest of the suspects, the following appears of record:

Q. [Defense Counsel] All right. So, that I'm clear and the court is clear, it was the quantity of the substance, the fact that you didn't see that any of them were sick, and that they were from out of town, is that correct?

A. That would be correct.

Q. And you can't think of anything else, as you're testifying here today, as far as why you we've [sic] wanted to arrest these people, or, in fact, did place them under arrest?

A. (No response.)

Q. Is that a fair statement?

A. There, we'd also gotten calls from 'Wal–Mart' prior to that. And large quantities of ephedrine had been turned up because of that.

Q. And none of these three individuals that you arrested that day ever said anything to you that they had the knowledge or ability to turn this product into methamphetamine, is that correct?

A. Correct.

Other than the fact the respondent possessed one of the numerous ingredients necessary to manufacture methamphetamines, which was not unlawful to possess and had a legitimate purpose, the other circumstances, in our view, are innocent factors which would not warrant an arrest for a violation of § 195.420, requiring an intent to create a controlled substance. Essentially, to carry its burden to show that there was probable cause to arrest the respondent for the crime of creation of methamphetamines and seize the antihistamines as evidence thereof, the State is essentially contending that people who possess antihistamines in the quantities purchased here, without visible signs of allergies, must be intending to manufacture methamphetamines. We reject this contention and, on the totality of the circumstances, find that the State failed to carry its burden to show that there was probable cause to believe that the respondent had the requisite intent to create methamphetamines so as to establish the necessary probable cause for his arrest for a violation of § 195.420, and incident thereto, for the seizure of the antihistamines.

If we were to condone the arrest of the respondent based on the circumstances presented, we would be greatly expanding the constitutional standard of probable cause, subjecting innocent citizens to unreasonable searches and seizures and sacrificing the protection of the Fourth Amendment. Although there is a tendency by our courts to avoid suppressing evidence where circumstances subsequently learned would substantiate the fact that criminal activity has, in fact, occurred, "this court regards the protection of the Fourth Amendment as more than a mere technicality." *Slavin*, 944 S.W.2d at 321. The Fourth Amendment should not be disregarded in an attempt to fight what is admittedly a serious crime, the manufacture of methamphetamines. As the Missouri Supreme Court said in *State v. Miller*, 894 S.W.2d 649, 657 (Mo. *banc* 1995), "The protection of the citizens' Fourth Amendment rights supersedes any benefit derived from bending the law to secure a single conviction."

Because the State failed to carry its burden in establishing probable cause to believe that the respondent had committed the crime of creation of methamphetamine, his arrest for the same and the seizure of the antihistamines as evidence thereof violated the Fourth Amendment and was unlawful.

Points I and II denied.

### Conclusion

The order of the trial court suppressing the evidence is affirmed.

SMART, P.J., and ELLIS, J., concur.