STATE of Missouri, Respondent,

v.

Bryan S. MONATH, Appellant.

No. WD 57578.

Missouri Court of Appeals, Western District.

Jan. 23, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 27, 2001.

Application to Transfer Denied May 29, 2001.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

Kent Denzel, Asst. Public Defender, Columbia, for Appellant.

Before SPINDEN, C.J., and EDWIN H. SMITH and HOWARD, JJ.

HOWARD, Judge.

A Lafayette County jury convicted Bryan S. Monath (hereinafter "defendant") of possession of a chemical with the intent to create a controlled substance, § 195.420,

RSMo 1994.[1] The trial court then sentenced him as a prior and persistent offender, § 558.016, to ten years imprisonment. Defendant now appeals from his conviction, raising two points on appeal. First, he contends that the trial court erred in denying his motion to suppress evidence, in admitting at trial the pseudoephedrine that the police seized from the vehicle in which he was a passenger, and in admitting the testimony of his co-defendant Robert Glidden, because there was no reasonable suspicion upon which to base the initial stop of the vehicle in which he was a passenger. Second, he contends that the trial court plainly erred in failing to declare a mistrial *sua sponte* because of the prosecutor's improper jury argument.

We affirm.

### Facts

Viewed in a light most favorable to the verdict, the facts are as follows:

On April 2, 1998, defendant and his acquaintance Robert Glidden entered a Break Time convenience store in Concordia, Missouri. Kelly Elling, Break Time's assistant manager, testified at defendant's suppression hearing that she recognized the two men because they had previously been in the store two or three times to buy Mini Thins containing pseudoephedrine.[2] She also testified that Break Time had a policy that would not allow her to sell more than one bottle of "pseudo" Mini Thins per customer per visit. Upon entering Break Time, defendant went to the Mini Thin display, which contained only the "regular" Mini Thins but not those containing pseudoephedrine, and Mr. Glidden went to the cooler at the back of the store. Defendant then informed Mr. Glidden that "they

[were] out," so Mr. Glidden walked out of the store. Defendant then asked Ms. Elling if there was a Dollar General store in town, obtained directions from her and left the store. As soon as he left, Ms. Elling obtained their license plate number and had her manager call the police. The police dispatcher testified that the Break Time manager had reported that the men attempted "to buy large quantities of cold medicine" and had given a description of the vehicle and the license plate number.

Herb Bryson, Concordia's chief of police, arrived at Break Time shortly after hearing the dispatch. Ms. Elling described to him defendant and Mr. Glidden, their vehicle and its license number, and their inquiry about buying "pseudo" Mini Thins. Chief Bryson knew that pseudoephedrine was commonly used in the manufacturing of methamphetamine.

In the meantime, defendant and Mr. Glidden arrived at the Dollar General. Defendant went inside and went directly to the aisle containing cold and cough medicines. He picked up six packages of the store's Swan nasal decongestant, a cold medicine containing pseudoephedrine, and took them to the front counter. Linda Bodenstab, the store's manager who had become "suspicious" when defendant acted "very nervous," informed him that Dollar General's policy prohibited the purchase of more than three cold medicines at a time. Defendant then put three of the boxes back, purchased three, and left the store. Ms. Bodenstab followed defendant to the door, noted the license plate number and description of the vehicle that defendant entered, and then called the Lafayette County Sheriff's Department. She report-

---

**1.** All statutory references are to the Missouri Revised Statutes (1994).

**2.** Pseudoephedrine is an over-the-counter cold medicine that is commonly known to be

used in the manufacturing of methamphetamines.

ed that someone had just attempted "to buy large quantities of cold medication," and she was suspicious of him. She gave the dispatcher the license plate number and a description of the vehicle. Thus, another dispatch concerning defendant and Mr. Glidden's actions went out over the police radios. After requesting assistance, Chief Bryson, who was already in the parking lot of the Dollar General when he heard the second dispatch from the county, immediately went inside. Chief Bryson observed as Mr. Glidden, who had entered the store immediately after defendant made his purchase and whom Ms. Bodenstab had pointed out to Chief Bryson by nodding her head, also purchased three boxes of Swan cold medication containing pseudoephedrine. Mr. Glidden then left the store and walked to the vehicle where defendant was waiting. Defendant moved to the passenger side, and Mr. Glidden sat in the driver's seat.

After Mr. Glidden left the Dollar General, Chief Bryson exited the store to his patrol car. He testified that he intended to pull over the vehicle in which defendant was a passenger for a registration violation, but he could not do so under the ordinance until the vehicle exited the public parking lot to a city street. Thus, he waited for the vehicle to pull out, but defendant and Mr. Glidden remained in their parked vehicle. Therefore, Chief Bryson pulled out of the parking lot, "anticipating pulling them over to the side when they passed [him]." However, the vehicle did not follow him. Instead, the vehicle turned the opposite direction out of the parking lot. Chief Bryson was unable to turn around and lost contact. Thus, he

again called for assistance from Lafayette County.

Officer Kent Shutt, a deputy sheriff with Lafayette County, heard the dispatches concerning attempts to purchase "large quantities of ephedrine" while on general road patrol. Dispatch eventually contacted Officer Shutt and advised him to head toward Concordia to assist Chief Bryson. Dispatch gave Officer Shutt a description of the vehicle and a license number.[3] Once he arrived in Concordia, he contacted Chief Bryson and learned that Chief Bryson had just missed them. Chief Bryson again described the vehicle and the two men to Officer Shutt. As Officer Shutt proceeded out of town in the direction in which the vehicle had last been seen traveling, he came upon a gravel road. He noticed a vehicle with two occupants matching the description he was given parked several hundred feet down on the side of the gravel road. When Officer Shutt turned and drove toward the vehicle, it "took off," passed him and turned onto the highway. As the vehicle passed, Officer Shutt had observed its license number. He then did a U-turn, activated his lights, and pulled them over.

As he approached the vehicle, Officer Shutt saw a Wal–Mart bag on the floorboard containing bottles and boxes of "what [he knew] to be pseudoephedrine and ephedrine." Officer Shutt asked Mr. Glidden to step back to his police vehicle with him, so he could obtain his identification and speak to him. After verifying Mr. Glidden's valid license, but finding that the license plate number he had did not match the vehicle, Officer Shutt obtained permis-

---

**3.** The dispatcher had run the license number reported and determined that it "did not check to" the kind of vehicle described by the convenience store managers in their separate calls. It was later determined, after the vehicle had been stopped, that the license plate number the dispatcher received was incorrect. The vehicle was correctly registered, but a "B" had been reported instead of a "D," hereby causing the dispatcher to report otherwise to the officers.

sion from Glidden to obtain his vehicle registration from the vehicle's glove compartment. In the glove compartment, Officer Shutt discovered eight Pyrex test tubes, which the deputy knew to be consistent with the use or manufacture of methamphetamines. Mr. Glidden "had no real explanation" for the tubes and verbally consented to a full search of his vehicle. Officer Shutt then discovered that in the Wal–Mart bag, which he had initially observed on the floorboard, were multiple containers of ephedrine or pseudoephedrine, more glass tubes, and some aluminum foil with "burn residue" on it. Mr. Glidden was arrested for the investigation of the production of narcotics. Defendant was arrested on an outstanding Pettis County warrant and also for investigation of narcotics production. Mr. Glidden later admitted that he intended to make methamphetamine and that defendant was helping him buy the pseudoephedrine he needed for this purpose.

Defendant was subsequently charged with possession of a chemical with the intent to create a controlled substance, § 195.420. At the hearing on defendant's pre-trial motion to suppress, Officers Bryson and Shutt, the two store clerks, Mr. Glidden and the police dispatcher all testified. The trial court denied his motion for suppression of evidence and statements arising from an illegal car stop and arrest. Defendant was subsequently convicted as charged by the jury and sentenced by the trial court. He then filed this appeal.

## Point I

■ Defendant first alleges that the trial court clearly erred in denying his motion to suppress evidence and in thereafter admitting the pseudoephedrine at trial. He also argues that the trial court plainly erred in admitting the testimony of Mr. Glidden concerning his and defendant's intent in purchasing the pseudoephedrine to make methamphetamines. Essentially, he argues that the evidence should have been suppressed, because Officer Shutt did not have the reasonable suspicion required for the initial stop of the vehicle, in which defendant was a passenger, which resulted in the discovery of the evidence used against him at trial.

## Standard of Review

■ We review the trial court's denial of defendant's motion to suppress by viewing the facts and reasonable inferences therefrom in a light most favorable to the trial court's order with the freedom to disregard contrary evidence and inferences. *State v. Franklin*, 841 S.W.2d 639, 641 (Mo. banc 1992) (holding that the police officer lacked the requisite reasonable suspicion to make an investigatory stop of respondent's vehicle and, therefore, the trial court's *granting* of the motion to suppress was not in error as alleged by the State). We base our review upon the whole record and the totality of the circumstances and will affirm if the ruling is supported by substantial evidence. *State v. Bohn*, 950 S.W.2d 277, 280 (Mo.App. E.D.1997). "The burden of going forward with the evidence and the risk of nonpersuasion shall be upon the state to show by a preponderance of the evidence that the motion to suppress should be overruled." § 542.296.6; *State v. Miller*, 894 S.W.2d 649, 652 (Mo. banc 1995). Thus, we will reverse only if we find clear error or, in other words, if we definitely and firmly believe that a mistake has been made. *State v. Tackett*, 12 S.W.3d 332, 336 (Mo. App. W.D.2000).

## Reasonable Suspicion for Brief Investigatory Stop of a Vehicle

Defendant contends that Officer Shutt lacked the requisite reasonable suspicion

to stop the vehicle. Thus, we must determine whether the initial stop of the vehicle in which defendant was a passenger was permissible under the Fourth Amendment of the United States Constitution.

■ Under the Fourth Amendment, which protects citizens from unreasonable searches and seizures, a law enforcement officer may briefly detain a person if he reasonably suspects, based upon specific and articulable facts, that the person was or is involved in criminal activity. *Franklin*, 841 S.W.2d at 641 (citing *Terry v. Ohio*, 392 U.S. 1, 27–28, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968)).[4] The officer may also "briefly stop[ ] a moving automobile to investigate, founded upon a reasonable suspicion that the occupants are involved in criminal activity, if the suspicion is supported by specific and articulable facts." *Franklin*, 841 S.W.2d at 641 (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975)). In determining whether reasonable suspicion for the initial stop of the vehicle was present, we must objectively assess the detaining officer's actions based on the facts and the totality of the circumstances confronting him at the time, not based upon his actual state of mind at the time the challenged action was taken. *State v. Slavin*, 944 S.W.2d 314,

318 (Mo.App. W.D.1997). Furthermore, the fact that the officer who detained defendant must have had a reasonable suspicion for the detainment does not necessarily require that he personally observed all of the facts that led to his reasonable suspicion. *Franklin*, 841 S.W.2d at 641.

■ We found the cases of *Franklin* and *Miller* instructive on the issue of whether Officer Shutt possessed the requisite reasonable suspicion for the initial stop of the vehicle in this case. Officer Shutt testified at the suppression hearing that he stopped the vehicle in which defendant was riding "because it matched, in [his] opinion, the description of the vehicle that had in fact been dispatched concerning the large quantities of ephedrine being purchased." In *Franklin*, the Missouri Supreme Court found that "[t]he logical application of *Hensley*[5] ... requires a finding that a police radio dispatch must be based upon reasonable suspicion if a stop initiated in reliance upon the dispatch is to be justified under the Fourth Amendment." *Franklin*, 841 S.W.2d at 643. Both the *Franklin* and *Miller* cases applied the three-part test created by the Supreme Court in *Hensley*, which requires the following:

(1) [T]hat the communication objectively supported the action taken by the offi-

---

**4.** We base this opinion on a determination of reasonable suspicion to initially stop the vehicle, not on the more stringent standard of probable cause to arrest without a warrant as discussed in this court's opinion on similar facts (viewed *in favor of* the trial court's suppression) in *Tackett*, 12 S.W.3d at 338–40. As set forth herein, unlike the *Tackett* holding that "[o]ther than the fact the respondent possessed one of the numerous ingredients necessary to manufacture methamphetamines, which was not unlawful to possess and had a legitimate purpose, the other circumstances ... [were] innocent factors which would not warrant an arrest for a violation of § 195.420," we find that there were circumstances in this case, in addition to the at-

tempted purchase and actual purchase of the pseudoephedrine, which support a reasonable suspicion to stop the vehicle in which defendant was a passenger. *Tackett*, 12 S.W.3d at 340.

**5.** *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) held that if the officer making a *Terry*-type stop relies on information provided by another officer or police department in a flyer, the requesting officer or department must have reasonable suspicion to make the stop in order for the evidence from the stop to be admissible. *Franklin*, 841 S.W.2d at 642.

cer; (2) that the communication was issued on the basis of a reasonable suspicion that the occupant of the vehicle had been involved in a crime; and (3) that the stop that in fact occurred was no more intrusive than would have been permitted the officer that originally communicated the information.

*Miller,* 894 S.W.2d at 652 (citing *Hensley,* 469 U.S. at 232–233, 105 S.Ct. at 682); *accord Franklin,* 841 S.W.2d at 643–44. The *Franklin* and *Miller* cases found that the second requirement of the *Hensley* test had not been satisfied, because " 'the record contain[ed] no evidence of a dispatch issued on the basis of reasonable suspicion, and the detaining officer did not personally observe, independent of the dispatch, any behavior that would justify the stop.' " *Miller,* 894 S.W.2d at 652 (quoting *Franklin,* 841 S.W.2d at 644).

However, the case now before us is factually distinguishable from the *Franklin* and *Miller* cases. The *Franklin* decision relies primarily on the fact that the State did not call the dispatcher to testify at the suppression hearing, and the record was silent as to the source of the information that led to the police dispatch. Thus, the supreme court could not determine from the record whether the dispatch was based upon reasonable suspicion. *Franklin,* 841 S.W.2d at 644. The *Miller* decision also notes that the State did not call the officer alleged to have been the source of the information from which the other officers derived their reasonable suspicion. Again, the supreme court could not determine how the officer knew or suspected the vehicle would be transporting narcotics. *Miller,* 894 S.W.2d at 654.

In the case now before us, the dispatcher, Chief Bryson and Officer Shutt testified concerning the facts and totality of the circumstances giving rise to reasonable suspicion to stop the vehicle in which defendant was a passenger: defendant and Mr. Glidden first attempted to purchase Mini Thins containing pseudoephedrine at Break Time, but the store was out; they then went directly to Dollar General, where defendant bought three packages of medicine containing pseudoephedrine (after attempting to buy six and learning of Dollar General's limit of three) and then his co-defendant returned immediately thereafter to buy the other three packages; both store employees were suspicious and contacted the police; the dispatcher relayed that the men were attempting to purchase "large quantities of ephedrine"; Chief Bryson, who had arrived to investigate Ms. Elling's and Ms. Bodenstab's reports to the police dispatcher, actually observed Mr. Glidden's purchase of three packages of pseudoephedrine; the men then waited in their vehicle until Chief Bryson left; they then turned in the opposite direction; Chief Bryson was unable to pursue, so he alerted Officer Shutt, who had heard all of the prior dispatches over his police radio; Officer Shutt later located a vehicle matching the description of the suspect vehicle on a country road; and when Officer Shutt drove toward the vehicle, it "took off." As a result, Officer Shutt turned around immediately and pulled the vehicle over.

Based on the collective information known by the police dispatcher, Chief Bryson and Officer Shutt and based on the totality of the circumstances, we hold that the State produced sufficient evidence at the suppression hearing that the initial stop of the vehicle in which defendant was a passenger was legal, because reasonable suspicion existed upon which to base the stop. Having so found, the trial court did not clearly err in denying defendant's motion to suppress or in admitting the seized pseudoephedrine at trial. Nor did the tri-

al court plainly err in admitting the testimony of Mr. Glidden, because the initial stop of the vehicle was legal.

Point I is denied.

## Point II

■ Defendant's second point on appeal involves alleged prosecutorial misconduct. He alleges that the trial court erred in failing to declare a mistrial, *sua sponte*, because the prosecutor misstated the facts and law, told the jury facts outside the record, and argued that defendant should be convicted for reasons "wholly irrelevant to his guilt."

Specifically, defendant alleges that the prosecutor:

A. Misstated the facts and law and told the jury facts outside the record [in the prosecutor's argument to the jury], that Mr. Glidden's agreement to testify came after he pleaded guilty and was not part of any deal; that another judge would have let Mr. Glidden out of prison whether or not he was released on probation for the offense for which he was jointly charged with [defendant]; that "Mr. Glidden pointed out it doesn't take that long to cook methamphetamine. . . . You have got a four to six hour window in a cook to try to catch them. It's not easy."

B. Argued that [defendant] should be convicted for reasons other than the evidence in the case: because methamphetamine is a dangerous cancer and society, i.e. the jury, had to convict [defendant] to tell methamphetamine "cooks" that this was wrong.

Defendant alleges that this misconduct led the jury to convict him in a manner that was manifestly unjust.

■ In order to preserve an allegation of error, defendant must have included it in his motion for new trial. Rule 29.11(d).[6] Defendant concedes that his trial counsel failed to object to these alleged errors at trial and also failed to raise the issue in a motion for a new trial. However, he alleges that we must review for plain error, because the prosecutor's alleged misconduct "created a manifest injustice and miscarriage of justice."

■ Because defendant did not raise this issue at the trial level, we can review it only for plain error. *State v. Armentrout*, 8 S.W.3d 99, 108 (Mo. banc 1999). Rule 30.20 affords us discretion in granting review for plain error. In order to receive plain error review, defendant is required to demonstrate that manifest injustice or a miscarriage of justice will occur if this court does not correct the error he complains of. *State v. Baller*, 949 S.W.2d 269, 272 (Mo.App. E.D.1997). Defendant bears the burden of showing that there is a reasonable probability that, in the absence of the alleged error by the prosecutor, the verdict would have been different. *Id.*

Moreover, it has been held that "[c]ourts should rarely grant relief on an assertion of plain error as to closing arguments, for in the absence of an objection and request for relief, the trial court's options are limited to an uninvited interference with summation, which increases the risk of error." *Baller*, 949 S.W.2d at 272. After reviewing the record, we find that defendant failed to meet his burden of proof, and we fail to see that this is a case for plain error review.

Point II is denied.

## Conclusion

Reasonable suspicion existed for Officer Shutt's initial stop of the vehicle in which

---

**6.** All rule references are to the Missouri Rules of Criminal Procedure (2000).

defendant was a passenger. Thus, the trial court did not clearly err in denying defendant's motion to suppress. Moreover, plain error review of alleged misstatements by the prosecutor was not warranted. Therefore, we affirm the trial court's judgment.

SPINDEN, C.J., and EDWIN H. SMITH, J., concur.